K.P.

v.

**Walter W. JUZWIC, Superintendent Norwich Public Schools and Norwich Board of Education.**

**Civ. No. 3:93CV01845 (AHN).**

United States District Court, D. Connecticut.

June 19, 1995.

Anne Louise Blanchard, Douglas M. Crockett, Connecticut Legal Services, Willimantic, CT, Catherine E. Cushman, State of Connecticut, for Persons With Disabilities, Hartford, CT, Catherine L. Williams, Connecticut Legal Services, Inc., Bridgeport, CT, for plaintiff.

Linda L. Yoder, Shipman & Goodwin, Mark J. Sommaruga, Michael Peter McKeon, Sullivan, Lettick & Schoen, Hartford, CT, for defendants.

NEVAS, District Judge.

After review and over objection, the Magistrate Judge's Recommended Ruling is approved, adopted and ratified.  SO ORDERED.

*RULING ON DEFENDANTS' MOTION FOR RECONSIDERATION AND MODIFIED RULING ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION*

FITZSIMMONS, United States Magistrate Judge.

This is an action for compensatory education under the Individuals with Disabilities Education Act ("IDEA")[1], against the Norwich Board of Education (the "Board") and the Superintendent of the Norwich Public Schools.[2]  K.P., the plaintiff, is a twenty-one-year-old with severe emotional disabilities whose claim that defendants deprived him of his rights to a free appropriate education while he was between 8 and 19 years old was never determined on its merits by the state hearing officer.  K.P. is appealing the state hearing officer's dismissal of his request for a

hearing for lack of jurisdiction on a finding that the request was untimely.[3]

Currently pending is a motion for reconsideration of this Court's ruling granting plaintiff's motion for a preliminary injunction.[4]  For the reasons stated below, the Court GRANTS the Motion for Reconsideration.  After reconsideration, the court AFFIRMS its earlier ruling on plaintiff's motion for a preliminary injunction [Doc. # 6], with modifications to the analysis in light of subsequently decided case law.

*ISSUES PRESENTED*

In determining whether the plaintiff was entitled to a preliminary injunction, this Court initially considered the plain language of the IDEA, the appropriate standard for measuring the timeliness of a request for a due process hearing, and the availability of compensatory education as a remedy for a denial of appropriate education.  The record of the proceedings before the state hearing officer was filed with the Court and reviewed.  Two witnesses testified for the plaintiff, at a hearing on the preliminary injunction held October 6, 1993, and one witness for the defendants.  Memoranda and proposed findings of fact and conclusions of law were submitted by both parties.  A Recommended Ruling granting the preliminary injunction was filed on December 23, 1993 [Doc. # 27], to which the parties had an opportunity to respond and object.  On reconsideration, the Court has also considered the issues raised by the *amici curiae*.

*BACKGROUND*

The Individuals with Disabilities Education Act ("IDEA") requires states, as a condition

---

1. 20 U.S.C. §§ 1400 *et seq.*  Jurisdiction over claims arising from federal statutes is conferred by 28 U.S.C. § 1331.  In addition, the court has jurisdiction over this appeal pursuant to 20 U.S.C. § 1415(e)(4)(A).

2. The complaint also cites the Fourteenth Amendment and the Rehabilitation Act as bases for his claims.

3. State of Connecticut Department of Education, Hearing Decision 93–47, August 30, 1993.

4. On January 10, 1994, defendant filed its objection to the recommended ruling [Doc. # 30]. Subsequently, several nonparties filed briefs *amicus curiae* raising arguments not before the court

when the recommended ruling was issued. *Amicus curiae* briefs were filed by the State Department of Education [Doc. # 39], the Connecticut Association of Boards of Education [Doc. # 58], Center for Law and Education, Inc. [Doc. # 41], and the State of Connecticut Office of Protection and Advocacy for Persons with Disabilities [Doc. # 42].  On May 4, 1994, Judge Nevas adopted and ratified the Recommended Ruling on the Motion for Preliminary Injunction.  On May 5, 1994, Judge Nevas issued a separate ruling construing the filing of the *amicus curiae* briefs as a Motion for Reconsideration of the recommended ruling and referred the motion to this Magistrate Judge.  [Doc. # 44].

of accepting federal funding, to provide "a free and appropriate public education" to all children with disabilities.[5] Congress' express purpose in enacting the Act was to

> assure that all children with disabilities have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of children with disabilities and their parents or guardians are protected . . . and to assess and assure the effectiveness of efforts to educate children with disabilities.[6]

To determine the appropriate education for each child, an Individualized Education Plan ("IEP") is created. This is a comprehensive written statement of the educational needs of a child, containing the specialized instruction and related services designed to meet this child's unique needs. The Act mandates that IEPs be developed in meetings between the child's teacher, a representative of the local educational agency, the parents of the child and the child, if possible, and reviewed at least annually.[7]

Under Connecticut law, when a child is initially identified as learning disabled, a Planning and Placement Team ("PPT") meeting is convened to develop an IEP for that child.[8] Subsequent developments or modifications in a child's IEP may be raised at any time by the parents, provided that a request for review is made to the school board and that the child's educational performance indicates the need for such review.[9]

If a local or regional board of education determines that a child's special education needs cannot be met by a program provided within the district or by agreement with another board of education, the board may meet its obligation to provide special education by paying the cost of special education instruction in a private school, hospital or institution.[10] When a child who requires special education is placed in a residential facility by a public agency, the local board of education shall "provide the requisite identification and evaluation" of the child in accordance with § 10–76a *et seq.* and "be financially responsible for the reasonable costs" of the child's special education instruction.[11] The costs for services other than educational are paid by the state agency that places the child.[12]

To accomplish the Act's goal of providing children with learning disabilities a free and appropriate public education, the Act provides "various procedural safeguards that guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think appropriate." *Honig v. Doe*, 484 U.S. 305, 311–312, 108 S.Ct. 592, 597–598, 98 L.Ed.2d 686 (1988). Foremost among the procedural safeguards provided for in the Act is the guarantee that parents [13] may contest "any matter relating to the identification, evalua-

---

5. Conn.Gen.Stat. § 10–76a *et seq.* establishes the policy that the state will pay for the special education of children identified in need of such education.

6. 20 U.S.C. § 1400(c), 20 U.S.C. § 1401(18). A disabled child is entitled to the benefits of the Act between the ages of three and twenty-one. 20 U.S.C. § 1412(2)(B). The Act included within the definition "children with disabilities" those children with serious emotional disturbance and specific learning disabilities. 20 U.S.C. § 1401(a)(1)(A)(i).

7. 20 U.S.C. § 1401(20).

8. Conn.Bd. of Educ.Reg. § 10–76d–11(a).

9. Conn.Bd. of Educ.Reg. § 10–76(d)–11(b) provides for review or revision to take place "periodically but not less than annually."

10. Conn.Gen.Stat. § 10–76d(d). (The board or commissioner must concur that the placement is "necessary and proper and no state institution is available to meet [the] child's needs").

11. *Id.*

12. *Id.; see Connecticut Assoc. of Child Caring Agencies v. Senatore*, No. CV 92–0703543S, 1993 WL 392911 *2 (Conn.Super. Sept. 29, 1993).

13. The term "parent" is defined to mean "a parent, a guardian, a person acting as a parent of a child, or a surrogate parent who has been appointed in accordance with § 300.514." 34 C.F.R. § 300.13.

tion, or educational placement of the child or the provision of a free appropriate public education to such child" in "an impartial due process [state administrative] hearing."[14] In Connecticut, this function is performed by the State Department of Education. Connecticut has established a hearing and appeal procedure consonant with the mandates of 20 U.S.C. § 1415.[15]

The Act's "stay put" provision directs that a disabled child "shall remain in the then current placement" pending completion of any review proceedings, unless the parents and state or local educational agencies otherwise agree.[16] While the Act allows for interim placements where parents and school officials are able to agree, it also authorizes the filing of a § 1415(e)(2) suit for "appropriate" injunctive relief where such an agreement cannot be reached.

At the conclusion of any impartial due process hearing, either the parents or the local educational agency may seek further administrative review, or may file a civil action in any state or federal court.[17] In the course of reviewing the administrative proceedings, the statute provides that the reviewing court

> shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of

the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(e)(2).

*FINDINGS OF FACT*

1. Plaintiff K.P. was born December 3, 1971. It is undisputed that he has severe neurologically-based emotional disabilities. (Ex. SB–17 p. 4).

2. K.P.'s mother was a resident of the Town of Norwich from before K.P.'s birth in 1971 until sometime after July 16, 1990.

3. In January, 1976, at age four, K.P. was evaluated by Newington Children's Hospital. It was recommended that he participate in special programming for the elimination of his dysfluencies (stuttering). (B–1, p. 1). Although it was recommended that K.P. remain in nursery school another year, he began kindergarten in the fall of 1976 in the Norwich School System. (B–3, p. 4, B–4, B–6, B–7).

4. In October, 1976, K.P.'s kindergarten teacher requested psychological services for him, stating in part, "many situations indicate that [K.P.] needs a different learning environment." (B–7, p. 2). The first Planning and Placement Team meeting was held and programming was developed in response to the psychological evaluation. (B–8). A second PPT meeting in April, 1977 recommended a program for "children with special needs in the area of social and emotional

---

**14.** 20 U.S.C. § 1415(b)(1)(E), § 1415(b)(2); *see* 34 C.F.R. § 300.506(a), 34 C.F.R. § 300.514(e)(1), (2); *see also* 20 U.S.C. § 1415(b)(1)(B). As a procedural safeguard for a hearing, the regulation provides for the assignment of a surrogate parent to protect the rights of the child, 34 C.F.R. § 300.13 (defining "parent"), 34 C.F.R. § 300.514 (defining "surrogate parents"), Conn.Gen.Stat. § 10–94g(a) (provides that a surrogate parent shall be appointed when a child is a ward of the state to represent the child in the "educational decision making process").

**15.** Conn.Gen.Stat. § 10–76h; *see* Conn.Bd. of Educ.Reg. § 10–76h–1 and § 10–76h–2.

**16.** 20 U.S.C. § 1415(e)(3). Conn.Bd. of Educ. Reg. § 10–76h–2(g)(2) provides: "Pending the hearing board's decision, the child shall remain in the educational program provided by the board of education prior to the time of the request for a hearing, unless the parties agree in

writing on an appropriate temporary placement."

**17.** 20 U.S.C. § 1415(c), (e)(2). Conn.Gen.Stat. § 4–183.

If the hearing is conducted by a local educational agency or an intermediate educational unit, any party aggrieved by its findings and decision may appeal to the State educational agency. 20 U.S.C. § 1415(c). Once the state administrative proceedings are exhausted, any aggrieved party "shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in State Court of competent jurisdiction or in district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(e)(2).

The Act also vests jurisdiction in federal district courts over all claims of noncompliance with the Act's procedural safeguards, regardless of the amount in controversy. 20 U.S.C. § 1415(e)(4)(A).

adjustment." (B–16). K.P.'s special education eligibility was verified on April 28, 1977. (B–19).

5. The record provides ample documentation of K.P.'s difficulties with school. It includes teacher evaluations, Individualized Education Programs and PPTs, plus numerous educational, medical and psychological evaluations. (*See*, B–20—B–67).

6. K.P. attended public school in Norwich until March, 1980. A PPT summary dated August 21, 1979 recommended that K.P. be referred to the Department of Children and Youth Services'[18] non-committed program for residential placement. (B–49, *see also* B–66). Norwich Board of Education entered into a non-committed shared placement arrangement with DCYS for K.P. (B–69).

7. On March 24, 1980, DCYS placed K.P. at Devereux–Rutland School in Rutland, Massachusetts. The placement was supposed to last until September, 1983. At the time of his admission, the plaintiff was eight years old. (SB–17 p. 7).

8. On October 8, 1983, K.P. was discharged from Devereux, at his mother's request, to resume living at home. He returned unsuccessfully to classes in the Norwich School System. (B–107).

9. On November 1, 1983, K.P. was admitted to Riverview Hospital for Children, a psychiatric facility, after his behavior at home became unmanageable. (B–114).

10. On February 15, 1984, K.P. returned to Devereux. DCYS placed K.P. back at Devereux with the understanding that petitions for his commitment to DCYS would be filed and that he would no longer be in the Non–Committed Treatment Program. (B–117).

11. In 1984, DCYS obtained a court order committing K.P. to DCYS. A surrogate parent was appointed by the State Board of Education to replace K.P.'s mother as his special education advocate, and to represent K.P. in the educational decision-making process.

12. DCYS placed K.P. at Devereux for "non-educational" reasons. (B–119). Norwich Board of Education entered into an agreement with Devereux, dated March 7, 1984, to assume the cost of the educational component of the placement. (B–121). Devereux agreed to provide, among other things, "a program of special education instruction to THE CHILD, which shall include instruction according to THE CHILD'S individual needs as described in the Individualized Education Program (IEP)." (B–121 p. 3).

13. Similar agreements between Devereux and Norwich Board of Education were entered into for each school year between 1984 and 1990. (B–121, B–123, B–129, B–140, B–151, B–169).[19]

14. K.P. lived at Devereux continuously for eight consecutive years, from age twelve through age nineteen.

15. On April 5, 1990, K.P. authorized the Office of Protection and Advocacy for Handicapped and Developmentally Disabled Persons to represent him on matters involving "program and placement needs." (B–177).

16. In the spring of 1990, Devereux indicated it intended to discharge K.P. prior to the 1990–1991 school year. K.P. was still a ward of the State of Connecticut. In May, 1990, K.P. was turned down for further placement at Devereux and was informed his placement would end in June 1990. (B–176). A hearing request was made on May 29, 1990 by the Office of Protection and Advocacy.[20] (Trans. 6/20/90, p. 4).

17. On July 16, 1990, a hearing was held at K.P.'s request with Norwich and DCYS as parties. The purpose of the hearing was to prevent K.P.'s pending discharge from Devereux until another placement was arranged.

---

**18.** DCYS has been changed to the Department of Children and Families. The records and parties refer to the agency as DCYS and for reasons of consistency, so do we.

**19.** There is no agreement in the record for the 1988–89 school year.

**20.** Connecticut Legal Services appeared on behalf of K.P. when the attorney for the Office of Protection and Advocacy left on maternity leave prior to K.P.'s hearing in June, 1990.

18. K.P.'s mother was appointed surrogate parent on July 16, 1990. (P–10).

19. Subsequent to the hearing request, K.P.'s mother moved to the town of Lisbon. The Lisbon Board of Education was substituted for Norwich as a defendant at the hearing.[21]

20. K.P.'s placement at Devereux was to be terminated on August 12, 1990. (P–12). However, the hearing officer ordered that K.P.'s placement at Devereux be maintained, or that he "stay put", until a proper placement was found by Lisbon. (P–8, p. 1).

21. A placement with Brown–Sullivan, Inc. was eventually obtained for K.P. sometime in 1991. Lisbon was financially responsible for his education until June 30, 1993, the end of the school year in which K.P. turned 21. (P–1, p. 2),

22. In March, 1993, K.P. began working for approximately 10 hours per week for wages at a food bank. This job was arranged and supervised by Brown–Sullivan. (P–1, p. 1).

23. On June 2, 1993, plaintiff requested a hearing before the Department of Education, seeking "compensatory educational services due to Norwich failing to provide a residential education program to [K.P.] while he was a student there." (SB–1).

24. On June 23, 1993, a Department of Education hearing officer held a conference with the parties off-the-record to identify the issues raised by K.P.'s claim. A Statement of Issues, dated June 23, 1993, identifies five issues as a result of the conference. (P-unnumbered, Hearing Decision 93–47, p. 2).

25. After the conference, the parties submitted briefs on the first issue, "[s]hould this hearing be dismissed because these claims relating to K.P. were not raised in a timely fashion?" (SB–17, SB–18). A hearing was convened on July 19, 1993, to address the timeliness issue. (Trans. 7/19/93 p. 3).

26. The hearing officer recalled the parties on August 19, 1993, for the sole purpose of informing counsel that the hearing request was not timely and that therefore the hearing officer lacked jurisdiction to hear K.P.'s claim. (Trans. 8/19/93 p. 2).

27. The hearing officer's formal written decision was filed August 30, 1993. (Hearing Decision 93–47, SB–22).

28. The decision states the an appeal "of the hearing board may be made to state or federal court by either party ..." in accordance with Conn.Gen.Stat. § 4–183 and 20 U.S.C. § 1415(e). (*Id.*).

29. An appeal of the hearing officer's decision was taken by commencement of this action on September 13, 1993.

30. K.P.'s statutory eligibility for special education ended on July 1, 1993. K.P. is currently residing at a Brown–Sullivan facility. The current cost of his placement is being borne in part by DCYS and primarily by Brown–Sullivan.

*CONCLUSIONS OF LAW*

In his motion for a preliminary injunction, K.P. asks this Court to order the Norwich Board of Education to maintain his current "educational and residential placement" during his appeal of the hearing officer's decision.

Resolving this request requires determining whether Norwich, which has not had responsibility for K.P.'s education since 1990, can and should be ordered to finance K.P.'s education until it is determined whether he is entitled to compensatory education for the years when Norwich was responsible for him.

1. *Applicable Standards*

■ Ordinarily, in the Second Circuit, a plaintiff seeking injunctive relief must demonstrate that he is likely to suffer irreparable harm if the injunction is not granted and "either (1) likelihood of success on the merits of its case, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in [ ] favor" of the party requesting preliminary relief. *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990). *See also Paulsen v. County of Nassau,* 925 F.2d 65, 68 (2d Cir.1991); *Eng v. Smith,* 849 F.2d 80, 82–83 (2d Cir.

**21.** The substitution of parties was made off the record.

1988); *American Postal Worker's Union v. United States Postal Serv.*, 766 F.2d 715, 721 (2d Cir.1985), *cert. denied*, 475 U.S. 1046, 106 S.Ct. 1262, 89 L.Ed.2d 572 (1986).

■ However, the IDEA includes a "status quo" provision which provides that while any proceedings conducted pursuant to the IDEA are pending, and absent an agreement providing otherwise, "the child *shall* remain in the then current educational placement...." 20 U.S.C. § 1415(e)(3) [emphasis added]. This provision has been described by the Supreme Court as a "clear directive," *Honig v. Doe*, 484 U.S. 305, 323, 108 S.Ct. 592, 604, 98 L.Ed.2d 686 (1988), and by the Second Circuit as providing an "automatic preliminary injunction." *Zvi D. v. Ambach*, 694 F.2d 904, 906 (2d Cir.1982). Section 1415(e)(3) "substitutes an absolute rule in favor of the status quo for the court's discretionary consideration of the factors of irreparable harm and either a likelihood of success on the merits or a fair ground for litigation and a balance of hardships." *Id.*

Because resolution of disagreements can be "long and tedious," *School Comm. of Burlington v. Dep't. of Educ. of Massachusetts*, 471 U.S. 359, 373, 105 S.Ct. 1996, 2004, 85 L.Ed.2d 385 (1985); *Honig*, 484 U.S. at 324–25, 108 S.Ct. at 604–05, in this Circuit the "status quo" provision has been interpreted to operate automatically when a parent or guardian presents a complaint to the school district regarding the evaluation or educational placement of a child. *See, e.g., Zvi D.*, 520 F.Supp. 196, 203 (E.D.N.Y.1981), *aff'd in part, modified on other grounds*, 694 F.2d 904 (2d Cir.1982); *Stellato v. Bd. of Educ. Ellenville Cent. School Dist.*, No. 89–CV–749, 1989 WL 87403 *9 (N.D.N.Y. Aug. 4, 1989).

■ While § 1415(e)(3) implicitly provides for interim financing during the pendency of proceedings, the statute does not address specifically who will fund the child's placement, and assumes that the currently responsible school district will be the party maintaining the placement. For example, in de-termining the financing of interim placement, the Second Circuit in *Zvi D.* stated:

> [u]nder the statute, the inquiry focuses on identifying "the then current educational placement," and, further, on who should pay for it, for implicit in the maintenance of the status quo is the requirement that a school district continue to finance an educational placement made by the agency and consented to by the parent before the parent requested a due process hearing. To cut off funds would amount to a unilateral change in placement, prohibited by the Act.

694 F.2d at 906. The same underlying assumption governs other IDEA cases. *See, e.g., Stellato*, 1989 WL 87403 *8; *Stacey G. v. Pasadena Indep. Sch. Dist.*, 695 F.2d 949, 952 (5th Cir.1983); *Christopher N. v. McDaniel*, 569 F.Supp. 291, 298 (N.D.Ga. 1983) (this section requires "that whoever was paying for the placement prior to review shall continue to do so while review is pending ..."); *Doe v. Anrig*, 692 F.2d 800, 810 (1st Cir.1982).[22]

This case, then, does *not* present the typical set of facts which face courts addressing the funding of interim placements under § 1415(e)(3). At the time the plaintiff sought his review hearing, the "current financing" of K.P.'s placement at Brown–Sullivan was provided by the Lisbon school system, which is not a defendant here and which discharged its legal obligation to K.P. by paying for his educational expenses through June 30, 1993. Instead, K.P. seeks to maintain his current placement at the expense of Norwich, against which he filed a claim for compensatory education for providing what he claims was an "inappropriate education" for the years 1983 to 1990.

So, notwithstanding the availability of the "automatic injunction" in favor of the plaintiff, under § 1415(e)(3), the granting of injunctive relief requires further analysis. Indiscriminately granting an "automatic injunction" which requires a currently non-responsible party to assume financial responsibility

---

**22.** *Overruled in part, Doe v. Brookline Sch. Comm.*, 722 F.2d 910, 917 (1st Cir.1983) ("To the degree that *Anrig* can be read as construing (e)(3) to preempt judicial powers of equity and to es-tablish in their stead an absolute freeze on interim placement, program and services, we overrule it.").

might provide an incentive for frivolous appeals to the courts. *See Zvi D.,* 520 F.Supp. at 203. As the First Circuit observed in *Doe v. Brookline Sch. Comm.,* "[m]erely by filing an appeal, parents can obtain the exact relief requested—maintenance of a publicly-funded private placement—and be insulated from reimbursement claims even though the public IEP is later ruled to be valid." *Doe,* 722 F.2d at 916 (1st Cir.1983).

■ Moreover, § 1415(e)(3) says nothing about financial responsibility, waiver, or parental right to reimbursement at the conclusion of judicial proceedings, and was not "intended to govern ultimate rights or obligations with respect to the expenses of placement." *Burlington Sch. Comm.,* 471 U.S. at 372, 105 S.Ct. at 2004 (1985); *Christopher N.,* 569 F.Supp. at 298. The Supreme Court recently ruled that a parent's entitlement to reimbursement requires findings that "the public placement violated IDEA, and that the private school placement was proper under the Act." *Florence County Sch. Dist. Four v. Carter By and Through Carter,* —— U.S. ——, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993).

However, "[t]he stay-put provision in no way purports to limit or pre-empt the authority conferred on courts by § 1415(e)(2); indeed, it says nothing whatever about judicial power." *Honig,* 484 U.S. at 327, 108 S.Ct. at 606. That provision [§ 1415(e)(3) ] and the policy underlying it can be read in conjunction with § 1415(e)(2) and its grant of authority to federal courts to fashion all appropriate equitable relief.[23] Prior decisions recognize the interplay between Sections (e)(2) and (e)(3), so that a court may base injunctive relief favoring the status quo on § 1415(e)(3) or base injunctive relief changing the funding of an educational placement on the court's traditional equitable powers under § 1415(e)(2). *Doe v. Brookline Sch. Comm.,* 722 F.2d at 918. As the Fifth Circuit put it, an "automatic preliminary injunction ... does not place a statutory bar to the district court's grant of acceptable relief that may result in a change of funding of the child's

placement, or a modification of the placement." *Stacey G.,* 695 F.2d at 955, n. 5.

In other words, the statutory presumption "in favor of the child's current placement" is properly analyzed in conjunction with the court's equitable powers under Section (e)(2). This requires weighing the IDEA's concern for a disabled child's right to due process, which includes a timely hearing and prompt decision, and this plaintiff's interest in receiving an appropriate education, against the costs to Norwich of being required to finance K.P.'s placement while this appeal is pending.

■ It is undisputed that termination of K.P.'s Brown–Sullivan placement at this point will immeasurably damage him and his prospects for living a productive life. There is prospective irreparable harm not only to K.P. but to the community, which may be required to provide services to him, and which may be harmed if he resorts to violence against himself or others, as the witnesses testified they believe he will. K.P.'s impulsive behavior, particularly regarding women, poses a potential danger to the community if he is unsupervised. (Ex. P–13, p. 3; P–14, p. 1). The primary academic goal of K.P.'s last IEP at Devereux, which was ostensibly preparing him for a transition into the community, was that he "identify the rights guaranteed by the Miranda ruling with 80 percent accuracy." (Ex. B–181, p. 18). Quibbling that no transition for K.P. was planned as the end of his current Brown–Sullivan placement approached in no way lessens the imminence or severity of the harm K.P. faces, should he have to leave there, and in fact the defendants agree that K.P. faces irreparable injury should his placement there be terminated now.

The prospective financial cost faced by Norwich under this injunction is not inconsequential—$5,600.00 per month for the period that K.P.'s claim is pending. While the Court may consider cost in making this determination, *P.J. v. State of Connecticut Bd.*

---

**23.** Section 1415(e)(2) states in pertinent part, In any action brought under this paragraph, the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

*of Educ.*, 788 F.Supp. 673, 680 (D.Conn.1992), in this situation cost does not counterbalance the nature of the harm facing K.P. Moreover, some or all of this expense may eventually be borne by other entities than the Norwich Board of Education.

Ultimately, financial responsibility for K.P. under the IDEA rests with the State Board of Education. The statutes, regulations, and legislative history all make clear that the state educational agency, in this case the Connecticut Board of Education, has the ultimate responsibility for assuring that all disabled children have the right to a free appropriate public education. *See* 20 U.S.C. § 1412(6); 34 C.F.R. § 300.600; S.Rep. No. 168, 94th Cong., 1st Sess. 24, *reprinted at* 1975 U.S.Code Cong. & Ad.News, 1425, 1448. *See also* 20 U.S.C. § 1413(a)(4)(B)(i); 34 C.F.R. § 300.401 (responsibility of state educational agency for children placed in private facilities).[24]

The regulations reflect that Congress intended the state educational agency to be "a central point of responsibility and accountability in the education of children with disabilities within each State." 34 C.F.R. § 300.600 (West, 1993) (comments). Quoting a Senate report, the comment states,

> Without this requirement, there is an abdication of responsibility for the education of handicapped children. Presently, in many States, responsibility is divided, depending upon the age of the handicapped child, sources of funding, and type of services delivered. While the committee understands that different agencies may, in fact, deliver services, the responsibility must remain in a central agency overseeing the education of handicapped children, so that failure to deliver services or the violation of the rights of handicapped children is squarely the responsibility of one agency.

S.Rep. 94–168 p. 24 (1975).

In this case, the state had not only its general responsibility for handicapped children but also direct parental responsibility for K.P. during the time for which he is claiming compensatory education. Between 1983 and 1990, K.P. was a ward of the state, with a state-appointed surrogate parent whose responsibility it was to oversee the provision of appropriate education to him. Particularly where, as here, the Devereux placement was made by the state for noneducational reasons, Norwich—which paid for the educational component of the Devereux program and presumably structured IEPs based on the feedback from Devereux—may not have been solely or even primarily responsible for the failure to provide appropriate education to K.P., if such a failure occurred.[25]

But the question of whether Norwich will be solely or primarily responsible for K.P.'s costs, either under an "automatic injunction" or in the event compensatory education is ordered can be left to the administrative process through the State of Connecticut Department of Education, which is ultimately

---

**24.** The statute provides that a state, in order to be eligible for federal funds, must have in effect a plan which assures that

children with disabilities in private schools and facilities will be provided special education and related services ... at no cost to their parents or guardian, if such children are placed in or referred to such schools or facilities by the State or appropriate local educational agency as the means of carrying out the requirements of [the IDEA] or any other applicable law requiring the provision of special education and related services to all children with disabilities within such State;

20 U.S.C. § 1413(a)(4)(B)(i). Federal regulation, 34 C.F.R. § 300.401 defines the responsibility of the Connecticut Board of Education for children placed in private facilities:

§ 300.401 Responsibility of State Educational Agency

Each SEA shall ensure that a child with a disability who is placed in or referred to a private school or facility by a public agency:
(a) Is provided special education and related services—
(1) In conformance with an IEP that meets the requirements of §§ 300.340–300.350;
(2) At no cost to the parents; and
(3) At a school or facility that meet the standards that apply to the SEA and LEAs (including the requirements of this part); and
(b) Has all of the rights of a child with a disability who is served by a public agency.

**25.** K.P. and Norwich may well have recourse to the parties responsible for providing oversight and/or services to K.P. during the years for which he seeks compensatory education, including the State Department of Education, DCYS, or Devereux.

responsible for the provision of funding and an appropriate education to K.P. In *Tonya K. v. Chicago Bd. of Educ.*, the district court apportioned financial responsibility for attorneys' fees between the city and state defendants, citing the state's "clear" responsibility under 20 U.S.C. § 1412(6) for assuring that local boards comply with the Act. No. 81–C–0580, 1987 WL 14699 *5 (N.D.Ill. July 22, 1987), *aff'd*, 847 F.2d 1243 (7th Cir.1988). The same court, in *Max M. v. Thompson*, 592 F.Supp. 1450, 1460 (N.D.Ill.1984), held that, under the Act, state officials could be found liable in their official capacity for the failure of a local school district to provide compensatory education.

This question of financial responsibility should be raised, in the first instance, in a due process administrative hearing by joining as parties the appropriate state agencies. The Supreme Court has held that a "post hoc determination of financial responsibility was contemplated in the legislative history" of the Act, observing that the question of "who remains financially responsible is a matter to which the due process procedures established under [the predecessor to § 1415] apply." *Burlington Sch. Comm.*, 471 U.S. at 371, 105 S.Ct. at 2003 (quoting S.Rep. No. 94–168, p. 32 (1975)).

However, where the issue before this Court at this point is whether K.P.'s placement at Brown–Sullivan shall continue or be terminated while these proceedings continue, equity demands that the placement be continued, and that, in the first instance, Norwich be responsible. At the time K.P. sought his due process hearing, his placement was being funded by Lisbon because in 1990 his mother had moved from Norwich to Lisbon. If, in June, 1992, Norwich had proceeded directly to a due process hearing on K.P.'s underlying claim for compensatory education, it is likely that the hearing officer's decision would have been issued earlier than August 31, 1993, and any gap in financing might have been averted. While Norwich had an absolute right to argue timeliness as a jurisdictional bar to the administrative hearing, its choice of a procedural defense rather than a defense on the merits was deliberate and admittedly calculated to forestall the hearing officer from determining the appropriateness of the education provided to K.P. by Norwich between 1983 and 1990. In light of this Court's finding that the hearing officer erred in her timeliness analysis, and should have reached and adjudicated the merits of K.P.'s claims of IDEA violations during the summer of 1993, it is not unfair that Norwich be required to maintain K.P.'s current placement at Brown–Sullivan until K.P. receives the due process hearing to which he is entitled by law.

### 2. *Timeliness of K.P.'s Due Process Hearing Request*

Technically, the mandate of the status quo provision applies whether or not a disabled child is likely to prevail on the merits of his underlying IDEA challenge. However, since this is a cause of action for compensatory education, sounding in equity, some judgment should be made about the merits of K.P.'s appeal in determining appropriate relief. A review of the statutes and caselaw indicates that K.P. is likely to win on his claim that he was improperly denied a due process hearing, in violation of the spirit and purpose of the Act, because the state hearing examiner decided that the request "was not filed in a timely manner".

The examiner did not ground her decision to deny K.P. a due process hearing on any specific legal theory. Instead, she quoted from Norwich's arguments for forty-five days and three years as the appropriate statutes to follow and concluded:

> Although it provides no statute of limitations for the filing of due process it clearly was not meant to spread across the lifetime of student years. Procedural violations could be discovered when a 'student' is age 40 or 50 and we would find ourselves tolling the time from that discovery.

(SB–22, pp. 8–9, Conclusion ¶ 9).

The parties agree that the IDEA statutes and regulations make no mention of a timeline or statute of limitations with respect to a request for a due process hearing. 20 U.S.C. § 1415(b)(1)(E), (b)(2); 34 C.F.R. § 300.506(a); Conn.Gen.Stat. § 10–76h; Conn.Bd. of Educ.Reg. § 10–76(g)(2). In most reported cases, for example, *Wills v.*

*Ferrandino,* 830 F.Supp. 116 (D.Conn.1993), the issue before the court has been the applicable statute of limitations period governing actions seeking judicial review of agency findings pursuant to § 1415(e)(2), rather than the applicable limitations period governing the timeliness of a request for an initial due process hearing before the state or local agency. The issue in this appeal, whether there is a statute of limitations governing requests for due process hearings under the IDEA, and—if so—what it is, is apparently a case of first impression in this district.

In general, a court interprets congressional silence on a statute of limitations period as a directive to "apply the most closely analogous statute of limitations under state law," *DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 158, 103 S.Ct. 2281, 2287, 76 L.Ed.2d 476 (1983), provided that "it is not inconsistent with federal law or policy to do so." *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). In determining the most analogous state statute of limitations, moreover, the court considers the essential nature of the federal claim and the extent to which the proceedings provided under the respective state and federal causes of action are functionally equivalent.

However, a statute of limitations need not be borrowed for all causes of action. The First Circuit in *Murphy v. Timberlane Regional School* held that the equitable defense of laches is "available to a claim for compensatory education" 973 F.2d 13, 16 (1992).[26] In *Murphy II,* on remand from the First Circuit, the district court in New Hampshire, quoting this passage from the First Circuit's opinion, found that the application of the doctrine of laches was more appropriate than borrowing a "mechanical" state statute of limitations. 819 F.Supp. 1127, 1132 (D.N.H. 1993). After the issuance of a Recommended Ruling on the Application for a Preliminary Injunction in this case, the First Circuit revisited the District Court's *Murphy II* decision. The Circuit Court rejected the district court's holding that "laches alone could provide a temporal limitation on the Murphy's compensatory education claim," and held that the New Hampshire six-year statute of limitations period for personal actions was the "more appropriate for application to the IDEA claim for compensatory education *in the present case." Murphy III,* 22 F.3d at 1190, 1193 (emphasis added). Because application of either a laches defense or alternative state statutes of limitation results in the same outcome in this case, this court has used both approaches in analyzing the likelihood of success for purposes of deciding whether a preliminary injunction is appropriate.

### A. Laches

Laches is an equitable defense, applied "where it is clear that a plaintiff unreasonably delayed in initiating an action and a defendant was prejudiced by the delay." *Robins Island Preservation Fund Inc., v. Southold Dev. Corp.,* 959 F.2d 409, 423 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 603, 121 L.Ed.2d 539 (1992); *Stone v. Williams,* 873 F.2d 620, 623 (2d Cir.1989), *cert. denied,* 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989); *Gardner v. Panama R.R. Co.,* 342 U.S. 29, 31, 72 S.Ct. 12, 13–14, 96 L.Ed. 31 (1951).

Under the circumstances of this case, plaintiff's delay for the period of 1983 through 1990 cannot be called unreasonable or inexcusable. The record shows that upon K.P.'s commitment to DCYS custody in 1984, a surrogate parent was appointed to replace K.P.'s mother as his special education advocate. The record also suggests that Mrs. P. lacked access to transportation and that her job often conflicted with PPT meetings during those years. Until she replaced the appointed surrogate parent in July, 1990, she had no legal standing to raise a claim on behalf of K.P. *See* Conn.Gen.Stat. § 10–94g(a). Nor was it incumbent on Mrs. P. to raise a compensatory education claim at the

---

**26.** For clarity, this ruling will cite to the *Murphy* opinions as follows: *Murphy v. Timberlane Regional School,* 973 F.2d 13 (1st Cir.1992) (Circuit Court vacated the District Court's ruling on summary judgment and remanded for a hearing on laches) *("Murphy I ")*; *Murphy v. Timberlane Regional School,* 819 F.Supp. 1127 (D.N.H.1993) (District Court's ruling on remand) *("Murphy II ")*; *aff'd on other grounds;* 22 F.3d 1186 (1st Cir.1994) *("Murphy III ").*

1990 hearing, when the record clearly indicates that the reason for the hearing was to provide a new placement for K.P. in light of his pending discharge from Devereux.

K.P. argues convincingly that the inappropriate nature of his previous placement at Devereux became apparent and gave rise to a claim for compensatory education only after his clear advancements at Brown–Sullivan. "Where [a] plaintiff has not slept on [his] rights, but has been prevented from asserting them based, for example, on justified ignorance of the facts constituting a cause of action, [or] personal disability ... the delay is reasonable and the equitable defense of laches will not bar an action." *Stone v. Williams,* 873 F.2d at 625.

Even if the delay were unreasonable or inexcusable, laches would not bar a claim unless the court also determined that the defendants have been prejudiced as a result of the plaintiff's delay. *Id.* Prejudice may also be found if "it would be inequitable in light of some change in defendant's position to permit plaintiff's claim to be enforced." *Id.* (citing *Holmberg v. Armbrecht,* 327 U.S. 392, 396, 66 S.Ct. 582, 584–85, 90 L.Ed. 743 (1946)). Norwich raises two claims of alleged prejudice: first, a decreased ability to vindicate itself because of unavailability of witnesses, fading memories or stale or lost records; and second, some unspecific disadvantage arising from Norwich's lack of responsibility for K.P. after June 1990. But there is no evidence in the record on which a finding of prejudice could be based. Nor did the hearing examiner make any findings of actual prejudice to the defendants. In any event, the mere unavailability of witnesses or passage of time is not attributable to the plaintiff. *See Murphy II,* 819 F.Supp. at 1132. There is no evidence before this Court, and there was none before the hearing officer, that the memories of witnesses faded, or essential documents were missing. *See Mur-*

*phy I,* 973 F.2d 13, 17 (1st Cir.1992); *Murphy II,* 819 F.Supp. at 1132–33 (the court's findings must be "based ... on the preponderance of the evidence.").

## B. *Alternative Statutes of Limitations Analysis*

We would reach the same result by applying the reasoning of other federal courts, which have characterized actions under the IDEA to be more closely analogous to tort/personal injury actions and have applied those statute of limitation periods. *See e.g. Janzen v. Knox County Bd. of Educ.,* 790 F.2d 484, 487 (6th Cir.1986) (five years) [27]; *Schimmel v. Spillane,* 819 F.2d 477, 482–83 (4th Cir.1987) (one year); *but see Murphy III,* 22 F.3d 1186 (1st Cir.1994) (applying six year limitations period for personal actions). The statute of limitations period for tort/personal injury actions in Connecticut is three years. Conn.Gen.Stat. § 52–577.

Federal law governs the question of when a federal claim accrues, notwithstanding that a state statute of limitations is to be used. *Leon v. Murphy,* 988 F.2d 303, 309 (2d Cir.1993). An IDEA action accrues "when the parents know or have reason to know of the injury which is the basis of their claim." *Hall v. Knott County Bd of Educ.,* 941 F.2d 402, 408 (6th Cir.1991), *cert. denied,* 502 U.S. 1077, 112 S.Ct. 982, 117 L.Ed.2d 144 (1992); *Murphy II,* 819 F.Supp. at 1129. In other words, the "plaintiff must be in possession of 'critical facts' which indicate that he has been hurt and that the defendants are responsible for this injury." *McDowell v. Fort Bend Indep. Sch. Dist.,* 737 F.Supp. 386 (S.D.Tex.1990).

We are persuaded by the plaintiff's argument that "[t]he discovery of the injury did not occur until well after K.P.'s placement in the community in June, 1991...." This action did not accrue until K.P.'s sub-

---

**27.** The Circuit Court in *Hall v. Knott County Bd. of Educ.,* explained that in addressing the appropriate limitations period under the IDEA, "the answer depends on the nature of the particular claim being asserted under the Act." 941 F.2d 402, 408 (1st Cir.1991), *cert. denied,* 502 U.S. 1077, 112 S.Ct. 982, 117 L.Ed.2d 144 (1992). "It is 'an imperative' ... that the selection of state limitations periods under the Education

Act be made 'on a case-by-case basis,' looking at 'the facts, the circumstances, the posture of the case and the legal theories presented.'" *Id.* (quoting, *Janzen,* 790 F.2d at 487). The First Circuit distinguished *Hall* in *Murphy III.* 22 F.3d at 1194.

stantial gains at Brown–Sullivan indicated that he had the capacity to develop life skills, and vocational skills and attain academic goals previously thought impossible.

In arguing that the appropriate limitations period to be applied in IDEA actions is the three-year statute of limitations governing Connecticut tort actions,[28] defendants contended that the last IEP developed by Norwich was dated May 29, 1990, over three years before the June 2, 1993 request for a due process hearing. However, the date of the last IEP is not the determinative one for statute of limitations purposes. K.P. challenges the IEPs and the implementation of his IEPs for the period of 1983–1990 on the basis that the education provided during all those years was "inappropriate". Moreover, the plaintiff contends that he was not aware that the education, services, and diminished expectations and goals provided at Devereux were "inappropriate" until he was placed with Brown–Sullivan and began to respond to the education he was receiving there.

Plaintiff did not become a resident of Brown–Sullivan until sometime in 1991. In December, 1992, K.P. turned 21 years old.[29] He began his job placement in March, 1993. Thereafter, plaintiff sought a due process hearing on June 2, 1993. Not only was the request made within a reasonable period of time from the discovery of the injury, but, applying either a statute of limitations period of six years for contract actions, as plaintiff asks, or a three year period for tort/personal injury actions, as defendants ask, the request for a due process hearing was not barred by a statute of limitations.

### 3. Compensatory Education

K.P. is entitled to a preliminary injunction on the basis of the policy enunciated in the status quo provision of the IDEA, a result further supported by our findings that he will be irreparably harmed if an injunction does not issue and that he is likely to prevail on the merits of his claim that he was improperly denied a due process hearing by the state hearing examiner. It is not necessary to reach the question of whether K.P. is entitled to compensatory education on his underlying challenge to the appropriateness of the education with which he was provided between 1983 and 1990 at this stage of these proceedings, and we decline to do so, except for the following observations.

Where the plaintiff seeks an equitable remedy, the prudent exercise of equitable powers suggests that the Court look at the underlying claim to assure itself that the claim at the heart of the lawsuit is not meritless.

The Individuals with Disabilities Education Act dictates that both the state and the local educational agency receiving federal funds are charged with the duty to provide disabled children with appropriate educations. 20 U.S.C. § 1414(d) (if a local educational agency is unable to furnish free appropriate education, state shall provide appropriate programs); 34 C.F.R. § 300.600. *See* 20 U.S.C. § 1401(18) (defining "free appropriate public education").

The Supreme Court has held that a state satisfies the requirement of providing a "free appropriate education" by,

> providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. Such instruction and services must be provided at public expense, must meet the State's regular educational standards, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP. In addition, the IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act and, if the child is being educated in

---

**28.** Defendants first argued for application of the 45-day statute of limitations applicable to the filing of an appeal of an administrative decision, Conn.Gen.Stat. § 4–183. We concur with the reasoning set forth in *Wills v. Ferrandino*, 830 F.Supp. 116 (D.Conn.1993), distinguishing an appeal from a request for a due process hearing.

**29.** Plaintiff argued that the statute of limitations period was tolled during the time he was committed to DCYS. During the period of commitment, a surrogate parent was appointed to act on his behalf. K.P.'s mother was unable to act for her son until July, 1990, when she was named as his surrogate.

the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade. *Board of Educ. v. Rowley,* 458 U.S. 176, 203–04, 102 S.Ct. 3034, 3049, 73 L.Ed.2d 690 (1982). But the *Rowley* Court interpreted the Act as requiring no more than a " 'basic floor of opportunity' consistent with equal protection," emphasizing that the goal of the IDEA was not to maximize each disabled student's potential, but rather, more basically, to provide access to public education. *Id.* at 200–201, 102 S.Ct. at 3047–3048. "Implicit in the congressional purpose of providing access to a "free appropriate public education" is the requirement that the education to which access is provided be sufficient to confer *some educational benefit* upon the [disabled] child." *Id.* [emphasis added].

■ In other words, while "appropriate" does not mean "potential maximizing," *P.J. v. State of Connecticut Bd. of Educ.,* 788 F.Supp. at 679, it does encompass "opportunity for some educational progress." *Lenn v. Portland Sch. Comm.,* No. Civ. 92–0011–P–H, 1992 WL 510895 *4 (D.Me. Dec. 14, 1992), *aff'd,* 998 F.2d 1083 (1st Cir.1993).

[19] When parents resort to federal court to enforce their rights under the statute, the district court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). Absent a showing that exhaustion of the administrative process would be futile or inadequate, judicial review is not available until all administrative proceedings are completed. *Honig v. Doe,* 484 U.S. at 327, 108 S.Ct. at 606.

K.P. charges that he made little or no academic progress and no progress in social skills during his second (nine-year) stay at Devereux, and that Norwich "made virtually no attempt to provide [him] with a meaningful education and evidenced no concern over the fact that he made no progress." The complaint alleges that K.P.'s reading level increased by one year after nine years at Devereux, and in other academic areas he

either remained static or dropped. Moreover, the plaintiff complains that Norwich "made virtually no attempt" to provide him with a "meaningful" education and failed to comply with a number of federal and state education laws and procedural protections.

If these claims are true, K.P. might well be entitled to a period of compensatory education, which is a recognized remedy in this Circuit and elsewhere for deprivation of the right to a free appropriate education. *Burr by Burr v. Ambach,* 863 F.2d 1071 (2d Cir. 1988), *vacated sub nom. Sobol v. Burr,* 492 U.S. 902, 109 S.Ct. 3209, 106 L.Ed.2d 560 (1989), *reaff'd, Burr by Burr v. Sobol,* 888 F.2d 258 (2d Cir.1989) *cert. denied, Sobol v. Burr,* 494 U.S. 1005, 110 S.Ct. 1298, 108 L.Ed.2d 475 (1990); *Mrs. C. v. Wheaton,* 916 F.2d 69 (2d Cir.1990); *Lester H. v. Gilhool,* 916 F.2d 865 (3rd Cir.1990), *cert. denied, Chester Upland Sch. Dist. v. Lester H.,* 499 U.S. 923, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991). And if the trial court agrees that the hearing officer improperly denied K.P. a hearing on the merits of his underlying claim, the trial court would certainly in light of the breadth of § 1415(e)(2) have jurisdiction to adjudicate the underlying claim for compensatory education.

■ However, the Act expresses a strong preference for the application of administrative expertise to questions of the appropriateness of education for disabled children. 20 U.S.C. § 1415(c), § 1415(e)(2); *see Honig v. Doe,* 484 U.S. 305, 327, 108 S.Ct. 592, 606, 98 L.Ed.2d 686; *Heldman v. Sobol,* 962 F.2d 148, 158 (2d Cir.1992). And the Supreme Court and appellate courts counsel that deference should be paid to decisions reached in good faith by hearing officers after due consideration is given to the relevant factors. *Rowley,* 458 U.S. at 206, 102 S.Ct. at 3050–51; *Riley v. Ambach,* 668 F.2d 635, 640 (2d Cir.1981); *Crocker v. Tenn. Secondary Sch. Athletic Ass'n.,* 873 F.2d 933, 935 (6th Cir. 1989).

The administrative record created to date in this case is long on arguments about legal issues like timeliness (in which non-lawyer hearing officers have no particular expertise) and painfully short on the issue where exper-

tise is needed, that is, whether K.P. received an education appropriate for his needs. But in other cases cited to this Court,[30] Connecticut's hearing officers have with skill and compassion been able to analyze individual children's needs and the sufficiency of the services provided, and have even ruled on more than one occasion that compensatory education was warranted for students beyond the age of 21. If the trial court ultimately rules that K.P. was improperly denied his hearing on the merits, it might reasonably choose, in light of that record, to defer the first decision on K.P.'s entitlement for compensatory education to the State Board of Education's administrative process.

*CONCLUSION*

Accordingly, this court's earlier ruling granting plaintiff's Motion for a Preliminary Injunction [Doc. # 6] is AFFIRMED with modifications to the analysis.

Defendant Norwich's Motion for Judgment on the Record [Doc. # 15] is DENIED.

Defendant's Motion to Strike Brief Amicus Curiae [Doc. # 60] is DENIED.

Under the authority of 20 U.S.C. § 1415(e)(2) and in accordance with § 1415(e)(3), defendants are ordered to pay the costs of maintaining K.P.'s current placement with Brown–Sullivan, until the resolution of his challenge to the appropriateness of the education provided him by the Norwich Board of Education or further order of the Court.[31]

Any objections to this recommended ruling must be filed with the Clerk of the Court within ten (10) days of the receipt of this order. Failure to object within ten (10) days may preclude appellate review. *See* 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 2 of the Local Rules for United States Magistrates; *Small v. Secretary of H.H.S.*, 892 F.2d 15 (2d Cir.1989).

Dated at Bridgeport, this 25th day of April, 1995.

---

30. Hearing Decision 93–17 (1993); Hearing Decision L.R.D. 90–24 (1990).

31. The Court is not determining at this time whether the whole placement at Brown–Sullivan is "educational." There is insufficient evidence on which to base such a determination.