873 F.2d 620
 1989 Copr.L.Dec. P 26,419, 10 U.S.P.Q.2d 1624
 Cathy Yvonne STONE, an Individual, Plaintiff-Appellant,
v.
Hank WILLIAMS, Jr., Billie Jean Williams Berlin, Chappell
Music Company, a Division of Chappell & Co., Inc., a
Delaware Corporation, Aberbach Enterprises, Ltd., a New York
Corporation, Acuff-Rose Opryland Music, Inc., a Tennessee
Corporation, Milene-Opryland Music, Inc., a Tennessee
Corporation, Wesley H. Rose and Roy Acuff, Individually and
as Trustees in Liquidation for Stockholders of Fred Rose
Music, Inc., and Milene Music, Inc., Fred Rose Music, Inc.,
a Tennessee Corporation, and Milene Music, Inc., a Tennessee
Corporation, Defendants-Appellees.
 No. 732, Docket 88-7860.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 1, 1989.
Decided April 21, 1989.
 
 Milton A. Rudin, Beverly Hills, Cal. (Joseph L. Golden, Susan H. Green, Rudin & Appel, Beverly Hills, Cal.; Marjorie M. Smith, Coblence Warner Hamilton & Smith, New York City, of counsel), for plaintiff-appellant.
 Alan L. Shulman, New York City (Robert J. Warner, Jr., Richard H. Frank, Jr., W. Michael Milom, Christian A. Horsnell, Silverman, Shulman & Slotnick, New York City, for defendants-appellees Hank Williams, Jr., Wesley H. Rose, Roy Acuff, Fred Rose Music, Inc. and Milene Music, Inc.; Lawrence I. Fox, Stephen K. Rush, Katherine M. Allen, Berger & Steingut, New York City, for defendants-appellees Acuff-Rose Opryland Music, Inc. and Milene-Opryland Music, Inc.; Thomas R. Levy, New York City, for defendants-appellees Billie Jean Williams Berlin, Chappell Music Co. and Aberbach Enterprises, Ltd., of counsel), for defendants-appellees.
 Before VAN GRAAFEILAND, CARDAMONE and PIERCE, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 Cathy Yvonne Stone brought this action in the United States District Court for the Southern District of New York (Keenan, J.) for her purported share of copyright renewal rights to songs composed by Hank Williams, Sr., her natural father. The defendants in this action are Hank Williams, Jr., the son of Hank Williams and stepson of Billie Jean Williams Berlin, who was married to Hank Williams at the time of his death, and a number of music companies or individuals that have obtained an interest in the copyright proceeds of the Williams' songs including: Aberbach Enterprises; Chappell Music Company; Acuff-Rose Opryland, Inc.; Milene-Opryland Music, Inc.; Fred Rose Music, Inc.; Milene Music, Inc.; Roy Acuff; and Wesley H. Rose. The sole issue presented is whether the district court abused its discretion when it granted defendants' motion for summary judgment and dismissed appellant's complaint on the grounds of laches. Even granting to Ms. Stone's situation the fullest stretch of sympathy, her own delay and procrastination in the end bars her suit. The district court's judgment, therefore, is affirmed.
 
 I FACTUAL BACKGROUND
 
 2
 The dispute arises over copyright renewal proceeds for 60 published and copyrighted songs written or performed by country and western singer Hank Williams (Williams, Sr.) who died intestate on January 1, 1953 at the age of 29. During his lifetime the well-known singer and composer wrote such popular hits as "Your Cheatin' Heart" and "Hey Good Lookin' ". We set forth the facts briefly in chronological order.
 
 
 3
 Appellant Stone was born on January 6, 1953 in Alabama, five days after Williams, Sr. died. While Ms. Stone's biological mother, Bobbie Jett, was pregnant with her in October of 1952, she and Williams, Sr. executed an agreement under which he acknowledged that he might be the father of appellant, but specifically did not admit paternity. The agreement further provided that Williams, Sr. pay Bobbie Jett for Ms. Stone's support, and placed the infant's custody until age 2 in Lillian Williams Stone, mother of Williams, Sr., who was present at the drafting and the execution of the agreement together with the two principals. Pursuant to its terms, Lillian Stone adopted plaintiff, and Bobbie Jett left for California. Until her death in 1955 Mrs. Stone cared for appellant. At that point, Williams, Sr.'s sister, Irene Smith, reneged on her promise to care for Cathy Stone if anything happened to Lillian Stone. As a result, appellant became a ward of the State of Alabama, and at age three in 1956 a foster child of the Deupree family. The Deuprees adopted her in 1959.
 
 
 4
 Williams, Sr. had a son, Hank Williams, Jr. The assignment of Hank Williams, Jr.'s copyright interests in his father's music generated litigation in 1967 and 1968 in the Circuit Court of Montgomery County, Alabama. That court appointed a guardian ad litem, attorney Drayton Hamilton, to ascertain any unknown potential heirs to the Williams' estate and to represent their interests. After investigating, Hamilton concluded that the only such person was appellant Stone. Unbeknownst to Ms. Stone, her adoptive family, the Deuprees, had asked Hamilton to leave her out of the 1967 proceedings, because they thought it unlikely that she would win and were worried that their then 14-year-old daughter would be subjected to embarrassing publicity because of her status as the illegitimate child of a famous country western singer. Nonetheless, Hamilton zealously litigated Ms. Stone's interests, but to no avail. The Alabama court determined that Hank Williams, Jr. was the sole heir of his father, and further held that appellant, as a natural child who had been adopted by another family, had no rights in any proceeds from the Williams, Sr.'s songs or their renewal rights. In reaching this conclusion, it relied on De Sylva v. Ballentine, 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1956) (holding that courts must look to state law to determine child's legal status for inheritance before evaluating the child's renewal rights under the Copyright Act).
 
 
 5
 After the disruptive first few years of her life, Ms. Stone appears to have enjoyed an ordinary childhood, and developed a closely bonded relationship with the Deuprees, with no knowledge of her natural parents. Then, in late 1973, shortly before appellant's 21st birthday, Mrs. Deupree told her of the rumors regarding the identity of her natural father, but added that everything had been decided against her. This disclosure was necessary because, upon turning age 21, Ms. Stone was entitled to a small inheritance from Williams, Sr.'s mother, Lillian Stone. The Deuprees were concerned that appellant might encounter reporters while claiming the inheritance and wanted to arm her with knowledge. After picking up the inheritance check (about $3,800) at the Mobile County Courthouse, Ms. Stone went to a library and read a biography on Williams, Sr., entitled Sing a Sad Song, written by Roger Williams. This book mentioned the possibility that Williams, Sr. had fathered an illegitimate daughter, and the author speculated on the child's entitlement to a renewal interest in his songs. Ms. Stone surmised that she might be that daughter.
 
 
 6
 In the following years, appellant asked the Deuprees about her background and talked to some attorney acquaintances, but did little else to ascertain her connection to Williams. She recalls that the Deuprees told her that there was nothing more to do. In 1979, she met with personnel from the state agency responsible for adoptions--the Alabama Department of Pensions and Securities--but states that she no longer remembers the substance of the conversation. The record, including appellant's deposition, suggests that her feelings about Williams' parentage were ambivalent.
 
 
 7
 Her attitude crystallized in 1980 when she received a telephone call from her adoptive father, George Deupree. Evidently alluding to his decision not to pursue Ms. Stone's rights in the 1967-68 lawsuits, Deupree told her that he had undergone a change of heart after seeing Hank Williams, Jr. on a television show. Deupree has since died, but appellant related the conversation in her deposition: "I want to ask you if you would like to find out if Hank Williams is your father. He said think about it. And he said I will help you in any way that I can. And he said I think I was wrong in withholding information from you and not discussing it. And I will do everything I can to help you."
 
 
 8
 Following this call, Ms. Stone stepped up her efforts to learn about her relationship to Williams, Sr. She looked up newspaper articles about him, and sought out his relatives and those of her natural mother, Bobbie Jett, who had also since died. She met with attorney Hamilton, her former guardian ad litem, and discussed with him the 1952 custody and support agreement between Bobbie Jett and Williams, Sr., and obtained the records from the 1967 and 1968 Circuit Court proceedings. But Ms. Stone did not examine those documents until after she met attorney Keith Adkinson (who later became her husband) in 1984.
 
 
 9
 Appellant filed the original declaratory judgment complaint in this action on September 12, 1985 which, as amended to include all of the above-named defendants, contains two claims. The first claim against all the defendants arises under the Copyright Acts of 1909 and 1976 and seeks a number of declarations, including that Ms. Stone is the natural daughter of Williams, Sr., and as such is entitled to a proportionate share of the renewal rights from his songs. The second claim alleges that certain of the defendants committed a conspiracy to defraud her.
 
 
 10
 In addition to this federal action, Hank Williams, Jr. and Ms. Stone sued each other in Alabama state court in 1985, each seeking a declaratory judgment on appellant's status vis-a-vis Hank Williams, Sr. That court held that even though Ms. Stone was the natural child of Williams, Sr., she was not his heir under Alabama law. Thus, it gave preclusive effect to the prior 1967 and 1968 Alabama Circuit Court state ruling.
 
 
 11
 Appellant and defendants moved for summary judgment in the instant action on a number of grounds including statute of limitations and res judicata. The district court, in granting defendants' motion for summary judgment and dismissing her complaint, relied on the doctrine of laches and did not reach the other issues.
 
 II DISCUSSION
 
 12
 Historically laches developed as an equitable defense based on the Latin maxim vigilantibus non dormientibus aequitas subvenit (equity aids the vigilant, not those who sleep on their rights). See Independent Bankers Ass'n of America v. Heimann, 627 F.2d 486, 488 (D.C.Cir.1980) (per curiam). In contrast to a statute of limitations that provides a time bar within which suit must be instituted, laches asks whether the plaintiff in asserting her rights was guilty of unreasonable delay that prejudiced the defendants. See, e.g., Gardner v. Panama Railroad Co., 342 U.S. 29, 31, 72 S.Ct. 12, 13, 96 L.Ed. 31 (1951); Lottie Joplin Thomas Trust v. Crown Publishers, Inc., 592 F.2d 651, 655 (2d Cir.1978). The answers to these questions are to be drawn from the equitable circumstances peculiar to each case.
 
 
 13
 A ruling on the applicability of laches is overturned only when it can be said to constitute an abuse of discretion. See Czaplicki v. The S.S. Hoegh Silvercloud, 351 U.S. 525, 534, 76 S.Ct. 946, 951, 100 L.Ed. 1387 (1956); Gardner v. Panama Railroad Co., 342 U.S. 29, 30, 72 S.Ct. 12, 13, 96 L.Ed. 31 (1951); Dickey v. Alcoa S.S. Co., 641 F.2d 81, 82 (2d Cir.1981) (per curiam). Because this is an appeal from a motion for summary judgment that dismissed appellant's complaint, we construe the record in the light most favorable to appellant. We therefore presume the correctness of the 1985 holding of the State Court of Alabama that Cathy Stone is the natural daughter of Hank Williams, Sr. See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam) (inferences must be drawn in favor of non-moving party).
 
 
 14
 We must analyze the reasonableness of delay and the resulting prejudice, see, e.g., Czaplicki, 351 U.S. at 533, 76 S.Ct. at 951; Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1040 (2d Cir.1980), to see whether there was a material issue of fact that should have been submitted to a jury. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986).
 
 A. Delay
 
 15
 Although laches promotes many of the same goals as a statute of limitations, the doctrine is more flexible and requires an assessment of the facts of each case--it is the reasonableness of the delay rather than the number of years that elapse which is the focus of inquiry. See Gardner, 342 U.S. at 31-32, 72 S.Ct. at 13-14 (the matter should not be determined by reference to mechanical application of statute of limitations; equities of parties must be considered); Holmberg v. Armbrecht, 327 U.S. 392, 396, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946); Wagg v. Herbert, 215 U.S. 546, 553, 30 S.Ct. 218, 220, 54 L.Ed. 321 (1910). In holding that Ms. Stone unreasonably delayed in bringing this action to have her rights declared, the district court focused on the years 1974-85, beginning with Mrs. Deupree's conversation with appellant regarding the inheritance, and ending with the filing of the complaint that initiated the instant case.
 
 
 16
 In our view, the delay for the period from 1974 to 1980 may well have been entirely excusable under the circumstances. First, her relationship with the Deuprees is by all indications the paradigm of a successful adoption. Thus, it is not surprising that loyalty and gratitude to Mr. and Mrs. Deupree, whom she considered her real parents, gave her pause at doing anything that might hurt their feelings. For this reason, George Deupree's telephone call to Ms. Stone is significant. Only after he called in 1980 could appellant be sure that investigating her natural parentage would not damage the only family bonds she knew. Second, Ms. Stone's embarrassment at asserting her relationship to Williams, Sr. is also understandable, because his notoriety would have made publicity almost impossible for her to avoid. This is substantiated by the extensive press coverage of the 1967 and 1968 court proceedings.
 
 
 17
 Third, only in recent years have courts and the general public come to recognize that children born of unmarried parents should not be penalized by being accorded a status for which they are not to blame. In the 1967 and 1968 proceedings, attorney Hamilton argued on Ms. Stone's behalf that discriminating against illegitimate children violated the Federal Constitution. Unfortunately for appellant, Hamilton was before his time; the case that would remove much of the stigma associated with illegitimacy was then pending before the Supreme Court, but not decided until after appellant's rights had been adjudicated. See Levy v. Louisiana, 391 U.S. 68, 72, 88 S.Ct. 1509, 1511, 20 L.Ed.2d 436 (1968) (holding unconstitutional state statute that discriminated against illegitimates to discourage births out of wedlock).
 
 
 18
 But even though Ms. Stone might arguably be excused for the reasons just stated from filing suit until 1980, there is simply no plausible explanation for delay in filing the instant complaint until September 1985, after five more years had passed. Appellant's filial loyalty is admirable, and one can sympathize with her feelings of embarrassment and trepidation attendant upon widespread personal publicity. But these reasons for delay cannot last forever for purposes of laches. A point arrives when a plaintiff must either assert her rights or lose them. Here Ms. Stone's procrastination and delay, which silently allowed time to slip away, remain as the only reason for her failure to bring suit earlier.
 
 
 19
 Where plaintiff has not slept on her rights, but has been prevented from asserting them based, for example, on justified ignorance of the facts constituting a cause of action, personal disability, or because of ongoing settlement negotiations, the delay is reasonable and the equitable defense of laches will not bar an action. See Note, Laches in Federal Substantive Law: Relation to Statutes of Limitation, 56 B.U.L.Rev. 940, 972 (1976). There is no such reasonable excuse, or any issue of fact presented in the instant case that would permit a jury to excuse appellant's delay for the five years beginning in 1980 and ending in September 1985.
 
 B. Prejudice
 
 20
 Laches is not imposed as a bar to suit simply because a plaintiff's delay is found unexcused; it must also be determined whether the defendants have been prejudiced as a result of that delay. See Saratoga Vichy Spring Co., 625 F.2d at 1040. Although an evaluation of prejudice is another subject of focus in laches analysis, it is integrally related to the inquiry regarding delay. Where there is no excuse for delay, as here, defendants need show little prejudice; a weak excuse for delay may, on the other hand, suffice to defeat a laches defense if no prejudice has been shown. See Larios v. Victory Carriers, Inc., 316 F.2d 63, 67 (2d Cir.1963). Defendants may be prejudiced in several different ways. See Gull Airborne Instruments, Inc. v. Weinberger, 694 F.2d 838, 844 (D.C.Cir.1982). One form of prejudice is the decreased ability of the defendants to vindicate themselves that results from the death of witnesses or on account of fading memories or stale evidence. Another type of prejudice operates on the principle that it would be inequitable in light of some change in defendant's position to permit plaintiff's claim to be enforced. See Holmberg, 327 U.S. at 396, 66 S.Ct. at 584. Defendants here were prejudiced in both ways.
 
 
 21
 As the district court noted, some of the key people having knowledge of the events preceding Ms. Stone's birth have died since 1974--George Deupree, Bobbie Jett and Audrey Mae Williams. All of their deaths are not equally prejudicial. For example, Bobbie Jett died in 1974, so absence of her testimony cannot be found to prejudice defendants because she would not have been alive to testify even if appellant had filed suit immediately. Nevertheless, the circumstances giving rise to this appeal have already spanned over two decades and the additional five years of Ms. Stone's unexcused delay doubtless would hamper the defense further--appellant's deposition reveals that even her memory has faded significantly in the interim. See Dickey v. Alcoa S.S. Co., 641 F.2d 81, 83 (2d Cir.1981). We conclude that the defendants were prejudiced to some degree by evidence that was lost by death or weakened during the delay. Because the defendants were injured in other ways by the delay, we need not hold that a finding of this kind of prejudice is alone sufficient to support the laches defense.
 
 
 22
 Prejudice may also be found if, during the period of delay, the circumstances or relationships between the parties have changed so that it would be unfair to let the suit go forward. The defendants have entered into numerous transactions involving Williams, Sr.'s songs. Ms. Stone responds that these transactions need not be unravelled--she could simply share in the profits. But that argument ignores the fact that the transactions were premised on the apparent certainty of the ownership of the songs' renewal rights--attributable to appellant's delay. This procrastination prejudiced defendants by lulling them into a false sense of security that the renewal rights were as they appeared and that she would not contest the 1967 and 1968 court rulings. See Independent Bankers Ass'n of America v. Heimann, 627 F.2d at 488 (D.C.Cir.1980); Carl Zeiss Stiftung v. VEB Carl Zeiss Jena, 433 F.2d 686, 704 (2d Cir.1970), cert. denied, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971).
 
 
 23
 We cannot be sure that defendants would have struck the bargains they did had they anticipated the diminution in their profits that Ms. Stone seeks. This result is logically not altered by whether the defendants made actual expenditures or whether they simply incurred the opportunity costs implicated in foregoing other ventures. As Judge Learned Hand wrote as a district court judge in a copyright case in which the plaintiff delayed for 16 years before filing suit, it would be unfair for a plaintiff "to stand inactive while the proposed infringer spends large sums of money in its exploitation, and to intervene only when his speculation has proved a success. Delay under such circumstances allows the owner to speculate without risk with the other's money; he cannot possibly lose, and he may win." Haas v. Leo Feist, Inc., 234 F. 105, 108 (S.D.N.Y.1916); see also Independent Bankers, 627 F.2d at 488. We therefore agree with the district court that the change in relationships and circumstances that occurred while Ms. Stone delayed would prejudice the defendants if the case were allowed to proceed at this late date.
 
 
 24
 Finally, we note that the underlying value of the laches doctrine, as with statutes of limitations, is that of repose. Even assuming that appellant's claims are meritorious, the availability of the laches defense represents a conclusion that the societal interest in a correct decision can be outweighed by the disruption its tardy filing would cause. Thus, courts, parties and witnesses "ought to be relieved of the burden of trying stale claims when a plaintiff has slept on his rights." See Burnett v. New York Central R.R. Co., 380 U.S. 424, 428, 85 S.Ct. 1050, 1054, 13 L.Ed.2d 941 (1965).
 
 III CONCLUSION
 
 25
 We hold therefore that Ms. Stone's delay in filing suit until September 1985 was unexcused and has prejudiced defendants. Accordingly, the order of the district court is affirmed.