BATISTE, et al.

v.

**CITY OF NEW HAVEN, et al.**

**No. CIV.A. 3:02CV983SRU.**

United States District Court,
D. Connecticut.

Dec. 23, 2002.

John R. Williams, Williams & Pattis, New Haven, CT, for Plaintiffs.

Thomas W. Ude, Jr., Martin S. Echter, Stacy L. Werner, Office of Corporation Counsel, New Haven, CT, Joseph P. Williams, Stephen M. Sedor, Amy E. Sou-

chuns, Shipman & Goodwin, Hartford, CT, for Defendants.

## MEMORANDUM OF DECISION

UNDERHILL, District Judge.

New Haven is in the midst of a ten-year $1.1 billion school construction program that involves renovating existing schools and constructing new schools. As part of the program, the City of New Haven ("City") and the New Haven Board of Education ("Board") (collectively, "defendants") plan to build the Prince–Welch School[1] at the "Kossuth Street Site,"[2] in the Upper Hill neighborhood ("Upper Hill")[3] of the City of New Haven. The Kossuth Street Site is in the heart of a densely populated, low-income area.[4] Thus, the project calls for the displacement of scores of residents and the destruction of numerous homes, some of which have historical value. The plaintiffs are all residents, former residents, neighborhood business owners or neighborhood-based institutions of the Upper Hill who claim that construction of the Prince–Welch School at the Kossuth Street Site displaces Upper Hill residents from their homes in a discriminatory manner and that there are more suitable sites available for the Prince–Welch School—sites that would have required the displacement of significantly fewer residents.

The plaintiffs initially moved for a preliminary injunction hearing. By agreement, the court ordered that the prelimi-

---

1. The Prince–Welch School will replace the Prince and Welch–Annex elementary schools, which presently serve students from both the Upper Hill and other parts of New Haven.

2. The Kossuth Street Site includes properties situated along Congress Avenue, both sides of Baldwin Street, both sides of Asylum Street, one side of Ward Street and one side of Davenport Avenue.

3. Definitions of the Upper Hill neighborhood vary. In this Opinion, the term "Upper Hill" will be used to refer generally to the entire larger area known as the Hill section of New Haven.

4. The site consists of 61 properties (50 structures, ten vacant lots, and one parking lot). Approximately 90 residents have been/will be required to move in order to accommodate the Prince–Welch School.

nary injunction be consolidated with a hearing on the merits pursuant to Rule 65(a)(2). The plaintiffs now ask the court for a permanent injunction requiring the defendants to: (1) refrain from seizing property, evicting residents, and building the Prince–Welch School at the Kossuth Street Site; (2) refrain from seizing property or evicting residents for school construction purposes in the Upper Hill; (3) initiate community meetings, fully accessible to all residents of the Upper Hill neighborhood, concerning any school construction plans for the neighborhood; (4) equalize construction of new school buildings throughout all neighborhoods in the City of New Haven and to refrain from concentrating such construction disproportionately in the Upper Hill Neighborhood; (5) revise any and all plans for construction of schools in the Upper Hill to eliminate the destruction of existing housing units; (6) refrain from evicting any person in connection with the Prince–Welch school construction program until the defendants have provided each such person with comparable suitable housing.

This decision follows a nine-day bench trial that was limited to issues of liability and injunctive relief. The parties agreed that, in the event the court ruled in favor of the plaintiffs on liability, consideration of the issue of damages would be heard after the court's ruling.[5] The following constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Allegations

The plaintiffs make three principal allegations. First, although the plaintiffs do not dispute that the Prince and Welch–Annex Schools must be closed, they contend that the Upper Hill does not need an additional school if the cost of such a school is the displacement of 90 Upper Hill residents from what is, in their opinion, the most affordable housing in New Haven. Instead of building a new school, the plaintiffs suggest that the other Upper Hill neighborhood schools can accommodate the Prince and Welch–Annex students. Thus, given the availability of an alternative solution to accommodate the Prince and Welch–Annex students and the shortage of affordable housing in New Haven, the plaintiffs claim that building an eight-acre school in a low-income residential neighborhood will have a disparate impact upon the predominantly African–American and Hispanic residents of the Kossuth Street Site by displacing African–Americans and Hispanics from the most affordable housing in New Haven. Accordingly, the plaintiffs make a disparate impact claim under Title VIII of the Civil Rights Act of 1968 (the Fair Housing Act), 42 U.S.C. §§ 3601 *et seq.*

Second, the plaintiffs contend that the defendants violated their constitutional rights during the site selection process. The plaintiffs claim that when the defendants conducted a similar school construction project in the Fair Haven neighborhood, the defendants actively encouraged the Fair Haven residents affected by the school construction project to participate in the site selection process. The plaintiffs argue that, when the defendants engaged in the Prince–Welch school construction project, the defendants intentionally excluded them from participating in the site selection process, and that the defendants intentionally excluded them on the basis of race. The plaintiffs contend that the defendants' intentional discrimination against them violated their rights under 42 U.S.C.

---

**5.** In their complaint, the plaintiffs sought damages under the Uniform Relocation Assistance Act., Conn. Gen.Stat. §§ 8–266 to 8–282. The plaintiffs did not actively pursue that claim at trial.

§ 1983 and the Equal Protection Clause of the Fourteenth Amendment.

Third, the plaintiffs allege that the defendants discriminated against them by arbitrarily and irrationally choosing the Kossuth Street Site for the Prince–Welch School. Because the defendants could have constructed the Prince–Welch School on a smaller parcel or on non-residential property, the plaintiffs accuse the defendants of intentionally selecting the Kossuth Street Site in order to displace the maximum possible number of Upper Hill residents. The plaintiffs argue that the defendants' arbitrary decision-making violated their rights under 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment. In addition to denying liability, the defendants raise several affirmative defenses. Principally, the defendants argue that plaintiffs' claims are barred under the doctrine of laches.

### Factual Background

#### The Existing Prince and Welch–Annex Schools

The Prince and Welch–Annex students need to be removed from the current substandard schools. Each school sits on less than half an acre of land, was built in the 1930's, and has inadequate facilities—including, but not limited to, no outdoor play space or fields, leaky roofs and windows, and no handicapped accessibility. In order to give the Prince and Welch–Annex students a satisfactory educational environment, the students need a much larger school. The defendants cannot expand the current Prince and Welch–Annex Schools because the area around the existing schools is now dedicated to medical and hospital facilities. Furthermore, renovating the 1930's schools to comply with state and federal guidelines would be prohibitively expensive, and neither renovating nor expanding the current schools furthers the defendants' goal of trying to minimize intra-district busing.[6]

The defendants selected the Kossuth Street Site after conducting a site selection process. That process included meetings of a site selection committee, a school-based building advisory committee ("SBBAC"), various city agencies, community developers, community groups, the Board of Aldermen, and the Upper Hill residents. The defendants selected the Kossuth Street Site for the Prince–Welch School because, among other reasons, the site is central to the student population of the Upper Hill neighborhood, a number of buildings within the site were vacant and/or tax delinquent and the construction of a school would eliminate a heavy concentration of blight in the Upper Hill. The defendants briefly considered building the Prince–Welch School at two non-residential locations in or near the Upper Hill.

The parties dispute whether the defendants need to build an additional school in the Upper Hill neighborhood to accommodate the Prince and Welch–Annex district students. The plaintiffs contend that the remaining Upper Hill neighborhood schools, excluding the Vincent Mauro Magnet School, can sufficiently accommodate the Prince and Welch–Annex district students.

The defendants counter that building a new school, more specifically building a new school at the Kossuth Street Site, is the only practical solution to meet the Prince and Welch–Annex students' educational needs.

---

**6.** The area around the Prince and Welch–Annex Schools has become dedicated to commercial and other non-residential uses such that extensive intra-district busing to the schools is now required.

### Alternatives to building the Prince–Welch School

Given the tremendous human and social costs associated with displacing numerous homeowners and tenants from their homes, it is surprising that the defendants did not consider alternatives to building a new school in the Upper Hill. The kindergarten through eighth grade ("K–8") schools in the Upper Hill already have more than enough capacity to enroll all K–8 students from the area; these schools currently accommodate hundreds of K–8 students from other parts of New Haven, who travel to the Upper Hill to attend school.

In the Upper Hill there are six neighborhood schools serving grades pre-Kindergarten through eight grade:[7] the Prince, Welch–Annex, Hill Central, Truman, Vincent Mauro Magnet, and Roberto Clemente Schools (Ex. # 268). Because the Vincent Mauro School is a magnet school, the defendants could· not have placed the Prince and Welch–Annex students in that school without affecting its educational mission. Excluding the Vincent Mauro Magnet School and the Prince and Welch–Annex Schools, there are approximately 875 out-of-district students who attend Upper Hill district schools, yet only 229 district students attend either the Prince or Welch–Annex School. *Id.* Thus, although it was certainly necessary to close the aging Prince and Welch–Annex schools, it does not follow that it was also necessary to build a new school to accommodate the students now attending those schools. The defendants could have placed the 229 students from the Prince and Welch–Annex district at other Upper Hill schools, and reassigned 229 out-of-district students to schools closer to their own homes.[8] Even if the defendants were concerned with providing Prince and Welch students their own district school, the defendants could have re-drawn school district lines. When questioned by the court about the possibility of re-drawing district lines or accommodating 229 students in other Upper Hill neighborhood schools, the defendants complained that either of these alternatives would be difficult or disruptive to the reassigned students. Although redrawing district lines or reassigning students would certainly be disruptive, those alternatives would cause disruption of a less serious kind and degree than evicting scores of residents and destroying their homes.

### The Site Selection Process

Independent of the plaintiffs' argument that the Upper Hill does not need an additional K–8 school, the plaintiffs also accuse the defendants of intentionally excluding them from the site selection process because the plaintiffs are African-American and/or Hispanic.

In May 1997, the defendants established a Site Selection Committee (the "Committee"). The Committee met three times to discuss potential sites for the Prince–Welch School (May 19, June 3, and June 12, 1997). The Committee was comprised of three alderpeople from the Upper Hill, representatives from LULAC Head Start,

---

7. The Hill Central School is pre-kindergarten through fifth grade. The Truman School is kindergarten through fifth grade. The Roberto Clement school is fifth grade through eighth grade.

8. To the extent that loss of the Prince and Welch–Annex facilities and the resulting reassignment required the defendants to build an additional school(s), that construction could have been done closer to the areas from which the out-of-district students now travel to attend schools in the Upper Hill. Still, the plaintiffs offered minimal evidence supporting the feasibility of dispersing Prince and Welch–Annex students to other neighborhood schools.

Board of Education, and New Haven City Planning Department ("City Plan"), the school principals of the Prince and Welch–Annex Schools and two parents of Prince and Welch–Annex students. (Ex. # 201). The Committee identified three potential sites: the Washington Avenue Site (a 4.98–acre parcel of city-owned land bordered by Washington Avenue, Cedar Street, Minor Street and Howard Avenue), the Kossuth Street Site (a 5.7–acre parcel of land bordered by Davenport Avenue, Kossuth Street, Congress Avenue and Asylum Street),[9] and the Pallet Site (a narrow parcel of land formerly used as a manufacturing facility, accessible from Ella Grasso Boulevard and parallel to Adeline Street). (Ex. # 1).

The Committee rejected the Washington Avenue Site as being too small (particularly because LULAC Head Start was planning to build a day care center there and expanding the site to include both facilities would involve acquisition of, at least, the Hill Health Center Clinic and other properties on Minor Street), as having grading issues, and as not being centrally located to the Prince and Welch–Annex district student population. (Ex. # 201). The Pallet Site was rejected because it was far from the Prince and Welch–Annex district student population and because its narrow configuration was considered undesirable for a school. *Id.* On June 3, 1997, the Committee reached a general consensus to recommend the Kossuth Street Site.[10] (Ex. # 512). Among other reasons, the Kossuth Street Site was selected because the site was centrally located to the school population, a number of buildings were vacant and/or tax delinquent, and the construction of a new school would eliminate a heavy concentration of blight and open up space in a crowded neighborhood. (Ex. # 201). At its June 12, 1997 meeting, the Committee walked the Kossuth Street Site and formally decided to recommend the Kossuth Street Site for the Prince–Welch School. On August 13, 1997, the Committee forwarded its recommendation of the Kossuth Street Site to the Citywide School Building Committee.[11]

In February 2000, the Citywide School Building Committee and the New Haven Board of Education approved expanding the Kossuth Street Site in order to accommodate a K–8 school. In June 2000 and November 2000, City Plan and the Board of Aldermen respectively approved the Kossuth Street Site.[12] (Ex. # 199). Thereafter, the City began to purchase properties at the Kossuth Street Site. *Id.*

### Notice to Upper Hill Residents

Within a few days after the Site Selection Committee recommended the Kossuth Street Site to the Citywide School Building Committee in June 1997, representatives from City Plan and the School Construction Program met with a group of 25 Prince and Welch–Annex School parents to

---

9. At this stage in the site selection process, the defendants intended to build a K–5 school. Once the defendants decided to build a K–8 school, the site shifted and expanded to include properties situated along Congress Avenue, both sides of Baldwin Street, both sides of Asylum Street, one side of Ward Street and one side of Davenport Avenue.

10. The Committee reached a consensus at its second meeting despite the fact that Alderman Tony Dawson, the community representative for the residents of the Kossuth Street Site, was absent from the first two meetings. (Ex.## 511, 512).

11. The Committee recommended only one site, despite Mayor DeStefano's charge to the Committee to recommend two or three potential sites. (Ex. # 512).

12. On March 19, 2002, the Connecticut Department of Education formally approved the Kossuth Street Site for the Prince–Welch School.

discuss the potential sites. (Ex. # 515). Flyers were sent to many, if not all, of the Prince and Welch–Annex students' parents, informing them of the meeting. (Ex. # 199). Over the course of the next four years, the defendants or defendants' representatives held approximately twelve community meetings to discuss the Prince–Welch Project. (Ex. # 563). Although the defendants did not actively encourage the Upper Hill residents to attend these meetings, the defendants did on several occasions mail and hand deliver flyers to the Upper Hill residents informing them of the meetings. *Id.* In addition to informing the Upper Hill residents of these meetings, School Construction Program representatives, in April 2000, mailed and hand delivered to the Upper Hill residents a "Project Information" flyer, written in English and Spanish, that informed the residents of the defendants' intentions to build the Prince–Welch School at the Kossuth Street Site. (Ex. # 532). Also in April 2000, members of the Livable City Initiative hand delivered an Occupational Survey (written in English and Spanish) "to all residents in the properties that the City was acquiring for the proposed Prince–Welch School." (Ex. # 533). On July 30, 2000, the New Haven Register published an article, "Schools squeeze neighborhoods," that discussed the defendants' plan to build the Prince–Welch School, and included a map of the proposed Kossuth Street Site. (Ex. # 622). The author of the article interviewed two of the plaintiffs. In the article, plaintiff Arlisse Edwards discussed her concern about being displaced from her home and plaintiff Reverend Bonita Grubbs, director of Christian Community Action, claimed

she welcomed the new school. (Ex. # 622). The article is important, not for the content of these plaintiffs' statements, but rather to demonstrate that these plaintiffs were aware by July 2000 of the defendants' intentions to build the Prince–Welch School at the Kossuth Street Site.[13]

On August 22, 2000, Joann Lombardo of the School Construction Program sent a letter to the Upper Hill residents affected by the school construction project, informing them of "the status of the new Prince–Welch School," and the steps necessary "to purchase properties for the new school." (Ex. # 536). The notice also informed the residents of an August 30, 2000 community meeting to be held at the Shekinah Glory Apostolic Church. (Ex. # 536). In addition to the August 22, 2000 letter, the defendants mailed and hand distributed flyers to Upper Hill residents informing them of the August 30, 2000 meeting. (Ex. # 199). Although the defendants did not actively seek to involve or inform Upper Hill residents concerning the Prince–Welch site selection prior to April 2000, the combination of their holding numerous public meetings and mailing and distributing flyers, was reasonably calculated to give the plaintiffs notice of their intentions to build the Prince–Welch School at the Kossuth Street Site. The court finds that by April 2000—or by August 2000 at the very latest—the plaintiffs were aware that the defendants had selected the Kossuth Street Site for the Prince–Welch School.

### Site Selection Processes Compared

The plaintiffs contend that when the defendants engaged in the Fair Haven school construction project, the defendants actively included the Fair Haven residents who

---

**13.** Other plaintiffs also had notice of the site location in or before the year 2000. *See* Ex. # 124 (plaintiff Margaret Harris had notice of the defendants' plan by April 1999); Ex. # 125 (plaintiff Gertrude Carney had notice of the defendants' plan by November 18, 1998); Ex. # 106 (plaintiff Reverand Drew Brees had notice of the defendants' plan by July 2000); Ex. # 127 (plaintiff Wynita Douglas had notice of the defendants' plan by August 2000).

were affected by the school construction project in the site selection process, yet the defendants intentionally excluded the plaintiffs from the Prince–Welch School site selection process.

The plaintiffs have offered minimal evidence supporting this contention. In fact, the weight of the evidence indicates that any differences in process resulted from initiatives taken by the Fair Haven residents rather than from discrimination against the Upper Hill residents. Significantly, within three months after the initial Fair Haven site was selected, approximately 40 to 60 Fair Haven residents attended one of the defendants' public meetings and voiced their complaints. (Weisselberg Testimony, Nov. 6, 2002). The Fair Haven residents took it upon themselves to get involved and participate in the site selection process, and there is no evidence that the defendants actively encouraged the Fair Haven residents to get involved. It was only after the residents voiced their concerns that the defendants changed the site location. The new site location included the Mill River condominiums. Shortly after the defendants decided to change locations, the Mill River tenants raised their concerns to the defendants. They attended public meetings, wrote the mayor with their concerns (Ex. # 142) visited the Mayor (Titus Testimony, Oct 30.2002), signed a petition against the new site location, and even issued a press release. (Ex. # 598). The press release noted their concern over their lack of involvement in the site selection process. In addition, the Fair Haven residents presented the defendants with a viable alternative location for the new school, while not compromising the defendants' objectives in building a neighborhood

school. (Titus Testimony, Oct. 30, 2002). Thereafter, the defendants modified their school design to avoid displacing some Fair Haven residents. (Ex. # 139).[14]

In Fair Haven, the defendants were able to modify the site location because there were other reasonable·locations available, and because the defendants became aware of the residents' complaints early enough in the process to avoid substantial developmental costs. In fact, at the time the defendants became aware of the Fair Haven residents' concerns, the defendants had not incurred any acquisition or design costs. (Weisselberg Testimony, Nov. 6, 2002). In contrast, the evidence indicates that the first time any of the plaintiffs raised a serious objection to the defendants' selection of the Kossuth Street Site was in March 2002, when they presented a series of demands to the Mayor. In April 2002, Upper Hill residents, including some of the plaintiffs, were involved in a "Save the Upper Hill Now" movement to rally people against the Prince–Welch Project. (Ex. # 185). That effort led to the filing of this lawsuit on June 12, 2002. By the time the plaintiffs first objected in March 2002, the Prince–Welch project had been underway for five years, and almost two years had passed since the plaintiffs became aware of the Prince–Welch Project. As a result of that delay, the plaintiffs were not similarly situated to the Fair Haven residents, because the defendants had spent millions of dollars on design and acquisition fees and had spent years devoted to the site selection, approval, and acquisition process. Thus, no meaningful comparisons between the two situations can be made. In addition, the plaintiffs failed to offer any evidence that the defendants excluded the plaintiffs from the site selection process because they are African–Ameri-

---

**14.** When the defendants re-designed the Fair Haven school, 30 residents instead of 78, were affected by the construction of the new school.

can and/or Hispanic,[15] or that the defendants re-designed the new Fair Haven school, but refused to re-design the Prince–Welch School, because the plaintiffs are African–American and/or Hispanic.

### The Choice of the Kossuth Street Site

The plaintiffs argue that the Kossuth Street Site is an inappropriate location for the Prince–Welch School because there are other suitable, non-residential locations within the Upper Hill that can accommodate the school. The plaintiffs have offered substantial evidence in support of this contention.

The Site Selection Committee identified potential sites for the Prince–Welch School based on a number of factors, including: (1) minimal acquisition and relocation costs, (2) areas with approximately five-acres or more of land, (3) areas that were likely to generate future school children, (4) areas with a high concentration of blighted, abandoned and tax-delinquent housing, and (5) areas with adequate play and outdoor space. The Committee then analyzed the advantages and disadvantages of the potential sites. (Ex. # 511)

The Committee cited many advantages to placing the Prince–Welch School at the Kossuth Street Site. The site was large enough to accommodate a K–8 school according to the State Department of Education recommended guidelines. Those guidelines recommend a five-acre or larger site for a school of 550 to 600 students. (Ex. # 511). Second, the Kossuth Street Site had a high concentration of blighted, abandoned and tax-delinquent properties, a situation that could be ameliorated with the construction of a new school. The properties at the site accounted for approximately $330,000 in delinquent taxes among them, and many of the properties were abandoned. (Ex. ## 527, 511). Third, the construction of a new school would open up space in an otherwise very crowded neighborhood. (Ex. # 511). Fourth, the site location would permit many of the Prince and Welch–Annex School students to walk to school.

The Kossuth Street Site is not without its disadvantages. In order to utilize the Kossuth Street Site, the defendants needed to assemble approximately 65 parcels of land (five of which were already owned by the City) at an acquisition cost of approximately $4.7 million. (Ex. # 250). The defendants were also concerned about displacing as many as 91 families, although their concern appears to have focused primarily on the bottom-line monetary costs (relocation costs) and the delays associated with acquisition of so may residential properties rather than on the dramatic human and social costs associated with displacing so many Upper Hill residents from their homes.

### The Washington Avenue Site

There are numerous advantages to building the Prince–Welch School on the Washington Avenue Site. Notably, because the City already owned much of the site, and because it was a non-residential site, minimal residential property would have to be acquired, and few residents would have to be displaced. (Ex. # 511). Furthermore, absent the need to relocate residents, the defendants would have incurred minimal delays in commencing construction.

There were some disadvantages to the Washington Avenue Site. The City-owned portion of the Washington Avenue Site

---

**15.** The Fair Haven residents, like the Upper Hill residents, were predominantly African–American and/or Hispanic, so it difficult to imagine the defendants treating the Upper Hill residents differently because of race.

consisted of only about four acres. In order to expand the site to five or more acres, the defendants would have had to acquire the Hill Health Center at a cost of approximately $1 million dollars. (Ex. # 512). In addition, a portion of the Washington Avenue Site was tentatively committed to LULAC, which intended to build a "Head Start" facility on the site. In order to expand the site to accommodate both the new school and LULAC, the defendants would have had to acquire the Hill Health Center ($1 million) and certain Minor Street properties ($3 million) at an additional cost of $4 million. *Id.* (Ex. # 511). By June 1997, LULAC already had funding and was starting the preliminary design. (Ex. # 512). Thus, at that point, it would also have been politically difficult to displace LULAC. In addition, the Washington Avenue Site required high development costs because the City would have had to level out extreme grade changes at a cost of approximately $1 million or more. (Ex. # 512). Moreover, because the Washington Avenue Site was not centrally located within the Upper Hill, the defendants were also concerned that placing the Prince–Welch School at the Washington Avenue Site would not ameliorate the defendants' current problems with extensive intra-district busing.

### The Pallet Site

The Site Selection Committee also considered, albeit briefly and not very seriously, the Pallet Street Site. There were many disadvantages to the Pallet Street Site. No portion of the site would be within school district boundaries. (Ex. # 512). The site is very narrow and not a suitable configuration for construction of a school. (Ex. ## 512, 516). At the same time, there is available space around the Pallet Site— space that is tax-delinquent, contains fewer residences and has low potential job loss—

that could have been included to make the Pallet site more attractive

## ANALYSIS

### The Fair Housing Act

The plaintiffs accuse the defendants of violating the Fair Housing Act ("FHA") by displacing them from the most affordable housing in New Haven on the basis of race.

■ Under the FHA, "it shall be unlawful [t]o ... make unavailable ... a dwelling to any person because of race [or] color." 42 U.S.C. § 3604(a). A FHA violation may be established under a disparate impact theory. *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 425 (2d Cir.1995); *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 933–34 (2d Cir.), *aff'd,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988). Disparate impact claims are premised on facially neutral policies or practices that are adopted without a discriminatory motive but that, when applied, have a discriminatory effect on a group of individuals who enjoy protected status under the anti-discrimination laws. *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934–36; *Tsombanidis v. City of West Haven* 180 F.Supp.2d 262, 289 (D.Conn.2001).

■ In order to establish a prima facie disparate impact claim under the FHA, a plaintiff must show that the challenged practice "actually or predictably" results in a greater adverse impact on a protected group than on others. *Tsombanidis,* 180 F.Supp.2d at 289. Discriminatory intent need not be shown. *Huntington Branch, NAACP,* 844 F.2d at 934–36. Two factors that will weigh heavily in plaintiffs' favor are: (1) evidence of discriminatory intent on the part of defendants (although evidence of discriminatory intent is not required); and (2) evidence that plaintiffs are seeking only to require defendants to

eliminate an obstacle to housing rather than suing to compel defendants to build housing (the former requiring a less substantial justification from defendant for its actions). *Tsombanidis,* 180 F.Supp.2d at 290. Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to "prove that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." *Huntington Branch, NAACP,* 844 F.2d at 936.

In *Huntington Branch, NAACP,* 844 F.2d at 939, the Second Circuit held that, in considering the defendants' justifications, the court should first consider whether there is a less discriminatory alternative. If there is no less discriminatory alternative, the court should scrutinize the justifications proffered by the defendants to determine their legitimacy and bona fide good faith by inquiring whether the reasons were of substantial concern such that they would justify a reasonable official in making the determination.

The plaintiffs are seeking to have the defendants eliminate an obstacle to their ability to live in affordable housing rather than seeking to require the City to construct housing for them. The plaintiffs, however, offered no evidence that the defendants intended to discriminate against them on the basis of race by constructing a school at the Kossuth Street Site. The plaintiffs did offer evidence that the defendants had options other than building the Prince–Welch School in a high-density, low-income, predominantly African–American and Hispanic neighborhood. Potentially, although the plaintiffs failed to offer significant evidence in support of this alternative, the defendants could have dispersed the Prince and Welch–Annex students throughout the other Upper Hill neighborhood schools. Another possibili-

ty, which the plaintiffs did prove, was that the defendants could have placed the new school at the Washington Avenue Site. For a disparate impact claim, the plaintiffs do not need to allege that the defendants acted irrationally or intentionally discriminated, rather they need only prove that the defendants' actions have had a discriminatory impact upon them.

The plaintiffs offered substantial evidence in support of a prima facie case that building the Prince–Welch School at the Kossuth Street Site would "actually or predictably" result in displacing predominantly African–American and Hispanic residents from affordable housing, certainly as compared to building the Prince–Welch School on non-residential land. The defendants offered little evidence to prove that there are no less discriminatory alternatives than building the Prince–Welch School at the Kossuth Street Site. Building the Prince–Welch School at the Washington Avenue Site would have resulted in displacing few, if any, African–American and Hispanic Upper Hill residents at an acquisition cost comparable to that for the Kossuth Street Site, even if the defendants had to acquire sufficient land to accommodate both the Prince–Welch School and LULAC. Because the plaintiffs waited almost two years to file their complaint, however, and because the defendants have placed a significant amount of time and money into the Kossuth Street Site prior to the plaintiffs filing suit, the court must determine whether the Fair Housing Act claim is barred under the doctrine of laches.

### Doctrine of Laches

 The defendants claim that the plaintiffs are estopped from asserting their claims for equitable relief under the doctrine of laches. "In contrast to a statute of limitations that provides a time bar within which suit must be instituted, laches asks

whether the plaintiff in asserting her rights was guilty of unreasonable delay that prejudiced the defendants."[16] *Stone v. Williams,* 873 F.2d 620, 623 (2d Cir.) *cert. denied,* 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362, *vacated on other grounds,* 891 F.2d 401 (1989), *cert. denied,* 496 U.S. 937, 110 S.Ct. 3215, 110 L.Ed.2d 662(1990); *see also Southside Fair Housing Committee v. City of New York,* 928 F.2d 1336, 1355–56 (2d Cir.1991) (laches may bar equal protection claims). To prevail on a defense of laches, a defendant must show that: "(1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay." *Ikelionwu v. United States,* 150 F.3d 233, 237 (2d Cir.1998).

The defendants have proven that, no later than August 2000, the plaintiffs were aware that they were going to be displaced from their homes in order to accommodate the Prince–Welch Project. The defendants have also demonstrated that the plaintiffs waited an unreasonable amount of time, following notice of the defendants' plan, before filing suit. *Mussington v. St. Luke's–Roosevelt Hosp. Center,* 824 F.Supp. 427, 433 (S.D.N.Y.1993). In *Mussington,* the court held that, despite the plaintiffs' "vociferous public opposition" to the defendants' construction plans, the plaintiffs were required to address their grievance in court, not in the political arena, in order to preserve their claims. *See also A.C. Aukerman Co. v. R.L. Chaides Const., Co.,* 960 F.2d 1020, 1028–29 (Fed.Cir.1992) ("In a legal context, laches may be defined as the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prej-

udice to the adverse party and operates as an equitable bar").

■■■ The plaintiffs filed suit on June 12, 2002. The defendants contend that the plaintiffs waited an unreasonable amount of time to file suit, and that the plaintiffs have not offered any reason why they waited so long to address their grievances in court. The defendants are correct on both contentions. Plaintiffs waited at least twenty-two months to file suit, which is an unreasonable amount of time, and the plaintiffs have not offered any justification for the delay. Proof of unreasonable delay is not sufficient to give rise to a laches defense, however, because the defendants must also prove that they were prejudiced as a result of the delay. *Majorica, S.A. v. R.H. Macy & Co., Inc.,* 762 F.2d 7 (2d Cir.1985). "Although an evaluation of prejudice is another subject of focus in laches analysis, it is integrally related to the inquiry regarding delay. Where there is no excuse for delay, defendants need show little prejudice; a weak excuse for delay may, on the other hand, suffice to defeat a laches defense if no prejudice has been shown." *Stone v. Williams, supra,* 873 F.2d at 625; *see Larios v. Victory Carriers, Inc.,* 316 F.2d 63, 67 (2d Cir. 1963). Prejudice may be found if it would be inequitable in light of some change in defendants' position to permit plaintiffs' claim to be enforced. *Stone v. Williams,* 873 F.2d at 625. In this case, because the plaintiffs have not offered an excuse for their delay in filing suit, the defendants need to show little prejudice. The defendants have demonstrated, however, that they would suffer significant prejudice were they required to start the Prince–Welch process again.

16. The defendants also raise a statute of limitations argument. Because the court is ruling in favor of the defendants under the doctrine of laches, it is unnecessary to rule on the defendants' statute of limitations defense.

For purposes of this analysis, the court finds that by August 30, 2000 the plaintiffs were aware that they were going to be displaced. Because the defendants did not acquire any properties before the plaintiffs had notice of the Prince–Welch Project, all costs the defendants incurred acquiring the plaintiffs' properties will constitute one aspect of the defendants' prejudice. By June 2002, the defendants had spent in excess of $3 million on site design and site acquisition activities.[17] (Ex. # 570). By June 2002, the defendants had spent in excess of $70,000 obtaining appraisals and performing title searches, and over $75,000 in demolition design fees. (Ex. # 570).

Another aspect of prejudice involves the enormous amount of time and energy the defendants spent on the Prince–Welch Project. The Site Selection Committee met for the first time in 1997. Once the site was selected, it was discussed, analyzed and approved at a number of different levels within the City and eventually the State. The process involved work by school officials, city planners, architects, traffic and environmental consultants, politicians, public servants and ordinary citizens. Because the chosen site was residential, tremendous efforts were undertaken to negotiate for the purchase of these properties, often following appraisals, and eminent domain proceedings. Substantial efforts were made to assist the affected residents in relocating to other housing.

The formal meetings related to the site were alone significant. Representatives from the Site Selection Committee and/or the defendants held approximately twelve community meeting between November 1998 and August 2001. (Ex. # 564). For some of these meetings, the defendants or representatives of the defendants mailed and hand delivered flyers informing the Upper Hill residents of the meetings. The Site Selection Committee and the SBBAC met approximately seventeen times between May, 1997 and November 2000. *Id.* The Citywide School Build Committee met three times between September 1997 and April 2001. *Id.* The Board of Education met four times between 1995 and 2001. *Id.* And the Board of Aldermen met four times between 1995 and 2000. *Id.* After all of these meetings and agency approvals, the State Board of Education approved the Kossuth Street Site in 2002. The site selection and approval process consumed, in total, five years of the defendants' time and effort. For at least two of those years, and likely more than two years, the plaintiffs were aware of the defendants' plan to purchase their homes. Under those circumstances, it would be inequitable to make the defendants begin this process anew in response to a tardy complaint. Finally, if construction at the Kossuth Street Site were enjoined, the defendants would be required to maintain the vacant, boarded-up structures that have and will become targets of vandalism, burglary and other criminal activity, until the properties can be sold. Those costs

17. The total value of recorded program expenditures as of June 2002 was approximately $5,700,000. That number reflects, despite the defendants' contentions to the contrary, some costs not dedicated to the design and acquisition of the Kossuth Street Site. The court finds that $3 million is a more appropriate reflection of the defendants' costs dedicated solely to the Kossuth Street Site. The court

also rejects the defendants' contention that they would be unable to mitigate their damages by reselling the acquired properties. Although, the defendants would stand to lose a significant amount of money, if the school construction were enjoined, some portion of the $3 million could be recouped through resale of the acquired properties.

and efforts represent further potential prejudice to the defendants.

Thus, because the plaintiffs have not offered a reason why they waited approximately two years before filing suit and because the defendants have demonstrated significant prejudice, the defense of laches bars plaintiffs' FHA claim.

### Equal Protections Claims

The plaintiffs make two intentional discrimination claims. First, the plaintiffs argue that the defendants discriminated against them on the basis of race by intentionally excluding them from the site selection process. Second, the plaintiffs make a "class of one" equal protection claim, arguing that the defendants discriminated against them by arbitrarily and irrationally deciding to place the Prince–Welch School at the Kossuth Street Site. Both of these claims fail on the merits and in the alternative, under the doctrine of laches.

### Intentional Discrimination Based on Race

The Equal Protection Clause requires that the government treat similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In order to make a prima facie case of intentional discrimination based on race, plaintiffs must show that (a) they were selectively treated compared with other similarly situated people, (b) that the selective treatment was based on race, and (c) that the decision makers "acted with

discriminatory purpose." *Knight v. Connecticut Department of Public Health*, 275 F.3d 156, 166 (2d Cir.2001) (quoting *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)). "'Discriminatory purpose' ... implies ... that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Southside Fair Housing Committee v. City of New York*, 928 F.2d 1336, 1352 (2d Cir.1991). In addition, 42 U.S.C § 1983 requires the defendants to employ their official powers to serve the proper ends of their governmental duties, not for the purpose of injuring the plaintiffs. *LeClair v. Saunders*, 627 F.2d 606, 610 (2d Cir.1980).

The plaintiffs contend that: (a) they are similarly situated to the residents who lived in and around the site of the Fair Haven construction project ("Fair Haven residents"),[18] (b) the defendants actively included the Fair Haven and East Rock residents in the site selection process, (c) the defendants intentionally excluded the plaintiffs from the Prince–Welch site selection process, and (d) the defendants intentionally excluded the plaintiffs from the site selection process because the plaintiffs are African–American and/or Hispanic.

■ Even if the plaintiffs could demonstrate proof of the other elements, the

---

**18.** In their complaint, the plaintiffs claimed that the defendants intentionally treated them differently than the Fair Haven residents and residents of the East Rock area with respect to their respective school construction programs. The court concludes that there is no merit to the plaintiffs' comparison to the East Rock residents. In East Rock, the defendants did not initiate a school construction plan. Rather, the site selection process began with citizen groups organizing and meeting with elected officials to discuss building a new school in their neighborhood. The East Rock residents were active and involved from the start and their involvement was not contingent on the defendants' attempts to include them. Thus, the concerns about citizen access to the process cannot by definition arise in East Rock, and the plaintiffs are not even arguably similarly situated to the East Rock residents.

plaintiffs failed to offer any evidence that the Site Selection Committee, the Board of Education, the City or any of the other City officials or agencies involved in the site selection process intentionally excluded them "because of" the fact that certain plaintiffs are African–American or Hispanic. During oral argument, plaintiffs effectively abandoned the claim that the defendants' actions were racially motivated and plaintiffs argued instead that they had proven a "class of one" equal protection violation. Accordingly, in the absence of any evidence that the defendants' actions were racially motivated, the claim fails. Alternatively, for the reasons discussed above, this claim would also fail under the doctrine of laches.

### "Class of One" Equal Protection Claim

 "Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class ... individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials" may also bring an equal protection claim. *Harlen Assoc. v. Incorporated Village of Mineola,* 273 F.3d 494, 499 (2d Cir.2001) (citing *LeClair v. Saunders,* 627 F.2d 606, 608–10 (2d Cir.1980)). The plaintiffs can establish a "class of one" equal protection claim by proving that (a) they were similarly situated to others, (b) they were intentionally treated differently from others similarly situated, and (c) there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam); *African Trade & Information Center, Inc. v. Abromaitis,* 294 F.3d 355, 362–63 (2d Cir. 2002). The court's duty to determine whether the defendants have offered a rational basis for the difference in the defendants' treatment "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Nor does it authorize "the judiciary [to] sit as a super-legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam). Accordingly, the court under a rational-basis review affords governmental decisions a "strong presumption of validity," *Heller v. Doe by Doe,* 509 U.S. 312, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993); *Kadrmas v. Dickinson Public Schools,* 487 U.S. 450, 462, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988), and will uphold a governmental decision "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe by Doe,* 113 S.Ct. at 2642; *Sullivan v. Stroop,* 496 U.S. 478, 485, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990).

 The plaintiffs contend that: (a) they are similarly situated to the Fair Haven residents, (b) the plaintiffs and the Fair Haven residents both complained to the defendants about being relocated after they learned that the defendants intended to construct a new school in their respective neighborhoods, (c) the defendants responded to the Fair Haven residents' complaints by modifying the school design to avoid displacing possible residents from their homes, yet they ignored the plaintiffs' objections to the selection of the Kossuth Street Site in order to intentionally displace the maximum number of Upper Hill homeowners and tenants, (d) defendants irrationally selected the Kossuth

Street Site because there are other locations available that could accommodate the Prince and Welch–Annex school students and require far fewer Upper Hill residents to move.

First, the plaintiffs are not similarly situated to the Fair Haven residents. The plaintiffs became aware of the defendants' intentions to build the Prince–Welch School at the Kossuth Street Site by April 2000—August 2000 at the latest. The plaintiffs did not raise significant objections to the Kossuth Street Site until, March 2002 at a meeting with the Mayor and April 2002 when the Upper Hill residents initiated the "Save The Upper Hill Now" movement. March 2002 is at least nineteen months after the plaintiffs became aware of the defendants' intentions. In contrast, the Fair Haven residents objected soon after the Board of Education approved the Fair Haven Site. (Titus Testimony, Oct. 30, 2002; Weisselberg Testimony, Nov. 6, 2002). Once they learned of the defendants' plan, the Fair Haven residents attended public meetings and voiced their concerns. (Titus Testimony, Oct. 30, 2002). They went to the Mayor's office and objected in person to Mayor DeStefano. *Id.* Seventy-five percent of the Mill River Condominium residents signed a petition to change the site location and they even issued a press release regarding their discontent with the defendants' site selection process. *Id.* Moreover, they presented the defendants with an alternative design that could accommodate the defendants' educational objectives while minimizing the displacement of Fair Haven residents. *Id.*

Second, the plaintiffs offered no evidence that the defendants intentionally treated them differently than the Fair Haven residents. In fact, the Fair Haven residents also felt excluded from the site selection process, as evidenced by their press release. Thus, it appears that the defendants did not actively include either the Fair Haven residents or the plaintiffs in their respective site selection processes. Third, because the Fair Haven residents had objected early in the process, the defendants had not spent any money on design, acquisition or appraisal costs, and because there was a suitable alternative that accommodated the defendants' objectives, the defendants were able to easily modify their site location. As compared to the Prince–Welch project, the plaintiffs only objected after the defendants had spent millions on, among other items, the combination of design, acquisition, and appraisal fees.

Fourth, the defendants offered rational reasons for selecting the Kossuth Street Site. Although there were available alternatives, there is certainly a "conceivable set of facts" that provide a rational basis for the defendants choosing the Kossuth Street Site over the alternatives. The site was of appropriate size, the site was centrally located to the students, the school provided an opportunity to remove blighted, abandoned and tax-delinquent properties, the school would open up space in an otherwise crowded neighborhood, and the site would not require extensive intra-district busing. Moreover, the defendants provided rational reasons why they did not select the Washington Avenue Site. The site was not central to the neighborhood and would therefore require extensive intra-district busing, part of the site was previously committed to LULAC, there would be high developmental costs, and there would be a potential loss of future tax revenue.

The court's duty is to decide this case based upon the evidence presented and the applicable law, not to impose on the defendants the outcome that the court would have chosen. The defendants made ra-

tional choices; that is all the law requires. Accordingly, the "class of one" equal protection claim fails. Alternatively, for the reasons discussed above, this claim would also fail under the doctrine of laches.

### CONCLUSION

The court rules in favor of the defendants on each of the plaintiffs' claims. The clerk shall enter judgment in favor of the defendants and shall close the file.

It is so ordered.